THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAWN LEE SCHREIBER, Defendant-Appellant.

First District (4th Division)    No. 80-1119

Opinion filed March 4, 1982.

James J. Doherty, Public Defender, of Chicago (R. H. R. Silvertrust, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Michele A. Grimaldi, and Thomas J. Murphy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ROMITI delivered the opinion of the court:

After having been convicted of the murder and robbery of Vito Falcone in a jury trial, defendant Dawn Lee Schreiber was sentenced to concurrent terms of 20 years and 7 years for those respective crimes. On appeal defendant contends: (1) certain statements she made following her arrest should have been suppressed because the arrest itself was illegal; (2) her guilt was not established beyond a reasonable doubt; (3) she was deprived of a fair trial by the prosecutor's final argument.

We affirm.

The evidence presented by the State at trial established the following pertinent facts. Vito Falcone lived on the first floor of a two-flat building at 1749 North Mayfield Avenue in Chicago. The building also contained a finished basement. At about 10 a.m. on June 5, 1978, Falcone's sister went to this home and discovered Falcone's body, bound hand and foot, gagged, and lying under a mattress. The first-floor apartment was ransacked and two television sets were missing. Police summoned to the scene were informed by a next-door neighbor that Falcone had been seen the afternoon before parking his car in the area in the company of a woman the witness had never seen before. The police were given a detailed description of this woman. According to the police the bindings on the body were so tight as to be imbedded in the skin. Bruises were visible on the victim's face and right elbow. No wallet or money was found in his clothes. About two feet from the bed was a hammer. In another room of the basement police found a bag containing women's clothing and various papers. Included in those papers were a photograph of a woman, two envelopes, and a letter, all bearing the defendant's name.

It was ascertained that defendant lived at 4727 North Malden Street in a hotel called the New Malden Arms. Half a block from that establishment police found the victim's Cadillac. Its tires, wheels, and interior had been stripped.

Police Investigator James Sesso went to the hotel and knocked on the door of Room 416, which he had learned was defendant's room. No one answered, and after the hotel manager let him into that room he proceeded to Room 421, registered to James Jackson. Sesso knocked and a woman opened the door. He identified himself as a police officer and asked the woman if she was the defendant. She said she was, and Sesso told her she was under arrest. During this conversation at the door Sesso had observed in the apartment, sitting on top of a television set, another television set which resembled one missing from the victim's home. After placing defendant under arrest and informing her of her rights, Sesso moved defendant into the apartment. In response to questioning she stated that her boyfriend, James Jackson, lived in the apartment but was

out of town for a week. At that time a man entered the apartment with a key. Sesso learned that he was James Jackson and arrested him.

Defendant was transferred to the police station where Sesso again questioned her. After reading her her rights and informing her of the incriminating evidence the police had, Sesso elicited from defendant the following account of the occurrence. Defendant had known the victim for two weeks; during the last week she had been living on and off in the basement apartment of his house. On June 4 she had gone to a carnival. At about 1 a.m., while in the company of James Jackson, she called Falcone to get a ride home. Falcone drove her to his house and after watching television with him she retired to the basement. Later Jackson and a man she knew as Terry Ellis knocked on her door, and she let them in.

About 15 minutes later Falcone came downstairs and objected to there being two black men in the apartment. When he told defendant to "get the niggers out of my house" Jackson and Ellis became enraged. They knocked him to the floor, tied and gagged him, and put him on the bed. Ellis gave defendant a hammer and told her to watch Falcone while they went upstairs to see what they could find. When Falcone began to struggle defendant hit him on the side with her fist and then hit him on the head with the hammer. During this time Jackson and Ellis were removing televisions and other items from the first floor and placing them in Jackson's car. Ellis drove that car to the New Malden Arms and defendant drove with Jackson in Falcone's Cadillac. Jackson parked that car in a lot near the hotel and stripped it of its wheels, tires, and interior parts. Later that morning defendant carried the black and white television from Jackson's car to his apartment.

Except for some details which we will set out, defendant repeated substantially the same account later that evening to an assistant state's attorney in a statement which was transcribed by a court reporter and then signed by defendant. In that statement, however, defendant said Ellis was also with her at the carnival. She saw both Jackson and Ellis strike Falcone before they bound and gagged him in the bathroom where they had chased him. She maintained that she did not intend to strike Falcone with the hammer, but had attempted to throw it at the wall. She also stated that she did not know if the man accompanying Jackson was Ellis because he wore sunglasses and a straw hat. Finally she also added that Jackson had told her he was going to call an ambulance for Falcone.

Defendant's fingerprints were found in the apartment where the events took place.

Dr. Lee F. Beamer was the pathologist who performed the autopsy on the victim June 6, 1978. However the files on the autopsy were subsequently lost. In order to refresh his memory, Beamer testified that he performed a second autopsy on September 21, 1978. Beamer recalled that

at the first autopsy the victim's arms were bound behind his back with cord and the legs were bound with a thicker electrical cord. The victim was gagged with intertwined towels and a glove. Beamer recalled that the bindings were tight; he also remembered observing contusions on the head and body.

For the second autopsy the victim was disentombed. Beamer observed some 20 contusions on the body, a laceration of the lip, and three contusions on the skull. He testified that those all were consistent with having been inflicted by the hammer found at the scene. The victim had been embalmed following the first autopsy and Beamer conceded that this process could cause the outlines of the contusions to be more easily discernible but he denied that embalming could actually change the form of the contusions.

Upon examination of the organs of the body and slide sections taken from them Beamer determined that the victim had moderate to focally severe coronary artery disease, also known as arteriosclerotic cardiovascular disease. He had reached this same conclusion after the first autopsy.

Beamer explained that one with this condition could suffer a heart attack because of it. When stress occurred the heart and respiratory rate increase; adrenalin is also released which also increases those rates. The heart can become unable to meet the increased demand of the body for oxygen, causing cardiac stoppage. In this case Beamer believed that mechanical stress had resulted from the victim having been bound, gagged, and having received numerous injuries to the body. Beamer testified that there was also psychological stress associated with this. It was his opinion to a reasonable degree of medical certainty that the cause of Falcone's death was "arteriosclerotic cardiovascular disease associated with mechanical stress." He found nothing else of significance that could have contributed to the death.

Beamer also testified that he found no clinical evidence of cardiac failure. However he stated that there were not always observable signs in the body after a person dies of a heart attack. For instance if the heart had gone into fibrillation there would be no signs of that after death. Beamer also testified that codeine was found in the victim's urine, although he did not know how much was present in his system at the time of death. He conceded that if there had been a high concentration of codeine the victim could have undergone little stress because of the sedative effect of that substance.

Defendant's sole witness was Dr. James T. Hicks, a pathologist who had examined the pathologic report and protocol from the second autopsy along with the slides taken from the body. Based upon those data and the condition of the body when it was found it was his opinion that the cause of death could not be determined. Hicks concluded that the

arteriosclerosis was not that severe. He stated that mechanical stress was not a medical term. Furthermore he found none of the usual evidence of cardiac failure such as blood in the liver or lungs or an accumulation of fluid in the abdomen. Hicks suggested that the numerous subcutaneous discolorations of the skin described by Beamer as contusions might have been caused by the embalming process and by decay. He testified that codeine could have sedated Falcone, reducing stress, but he conceded that he could not determine how much codeine was in the system at the time of the occurrence because the time of death had not been established.

Hicks admitted that some of the contusions, which were shown in a photograph taken when the body was found, could not have been caused by the factors he had mentioned. He also conceded that being assaulted, bound and gagged would be stressful and that stress could precipitate acute failure of the heart in a person with advanced coronary arteriosclerosis in the manner described by Beamer. He also testified that if as the result of this the heart went into ventricular fibrillation, a condition described as the irregular and affective beating of the heart, death could result with no physical signs remaining at the autopsy.

## I

Defendant first contends that the statements she made following her arrest should have been suppressed because the arrest itself was illegal, having been made without probable cause and without a warrant.

On the issue of probable cause, the evidence adduced at the hearing on defendant's motion to suppress and at trial established that when Officer Sesso knocked on the door of Room 421 of the New Malden Arms he knew the following. In the basement where the victim's body was found police had found a bag containing documents and a photograph of a woman, all bearing the name of Dawn Schreiber. Officer Sesso had the photograph of the woman and also had a detailed description of a woman who had been seen with the victim the evening before his body was discovered. Two television sets had been taken from the victim's home. Also taken was the victim's Cadillac. It was found one-half block from the New Malden Arms, stripped of its wheels and tires and much of its interior. The police had ascertained that Dawn Schreiber lived at the New Malden Arms. When a woman opened the door of Room 421 Sesso identified himself and asked if she was Dawn Schreiber. She replied that she was and was placed under arrest. During this conversation Sesso observed through the open door a television set, placed on top of a second set, which resembled one of those missing from the victim's home. These facts were sufficient to give Officer Sesso reasonable grounds to believe defendant was criminally involved in the victim's death; thus, he pos-

sessed probable cause to make the arrest. *People v. Wilson* (1970), 45 Ill. 2d 581, 262 N.E.2d 441.

But defendant also contends the arrest was improper because it was made without a warrant, citing *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. *Payton* held that under the fourth amendment police were prohibited from making a warrantless and nonconsensual entry into a suspect's home to make an arrest unless exigent circumstances were present. In a subsequent case that holding was extended to entries into the homes of third parties, but the court left undecided the issue of whether the subject of such an arrest would have standing to challenge the violation. (*Steagald v. United States* (1981), 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642.) But we do not reach the issue of defendant's standing to challenge her arrest, for we find that in any event it was properly made without a warrant. Defendant was arrested at the entrance of the room, after she voluntarily opened the door in response to the officer's knocking. We find that under such circumstances her arrest was made in a public place, so that no warrant was required. In *United States v. Santana* (1976), 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406, the police approached a suspect's home and observed her standing in the doorway. When they identified themselves and approached she retreated into the home. The court ruled that when the police first sought to arrest the woman, while she was standing in her doorway, she was in a public place:

> "While it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment [defendant] was in a 'public' place. She was not in an area where she had any expectation of privacy. 'What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.' Katz v. United States, 389 U.S. 347, 351, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. Hester v. United States, 265 U.S. 57, 59, 68 L. Ed. 898, 44 S. Ct. 445 (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in [United States v. Watson (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820]." (427 U.S. 38, 42, 49 L. Ed. 2d 300, 305, 96 S. Ct. 2406, 2409.)

The court went on to hold that defendant's subsequent retreat into her home could not be used to thwart an otherwise proper arrest; the arrest which ultimately was made in the home was justified by the exigent

circumstance of hot pursuit. Our research has uncovered no case on point in Illinois, but the courts of a number of other jurisdictions have applied *Santana* and have found warrantless arrests to have been properly made in a public place where a suspect has come to the door in response to police knocking. *People v. Burns* (1980), ___ Colo. ___, 615 P.2d 686; *United States v. Botero* (9th Cir. 1978), 589 F.2d 430, *cert. denied* (1979), 441 U.S. 944, 60 L. Ed. 2d 1045, 99 S. Ct. 2161; *United States v. Herring* (10th Cir. 1978), 582 F.2d 535; *cf. United States v. Johnson* (9th Cir. 1980), 626 F.2d 753, *cert. allowed* (1981), ___ U.S. ___, 70 L. Ed. 2d 82, 102 S. Ct. 89 (warrantless arrest at door improper because agents used false identification and had guns drawn, so that defendant's appearance at door was nonconsensual).

■■ In the case at bar there was no evidence to suggest that subterfuge was used or that defendant was in any manner coerced into opening the door and thus exposing herself to public view. She voluntarily identified herself to the police and was arrested at the entrance to the room. Accordingly, we find that her warrantless arrest was proper, and the statements she made following that arrest were properly introduced at trial.

## II

We find no merit to defendant's contention that her guilt was not established beyond a reasonable doubt. Defendant's contention relates solely to the issue of the criminal agency causing death, which of course must be proven beyond a reasonable doubt in a murder case. (*People v. Benson* (1960), 19 Ill. 2d 50, 166 N.E.2d 80.) On that issue the State's expert witness, Dr. Beamer, testified that he found the victim to have moderate to focally severe coronary artery disease. He further testified that stress in one with such a disease often causes cardiac stoppage, and he explained the manner in which this would occur. The victim in this case was bound tightly hand and foot, gagged, and numerous contusions were found on his head and body. Beamer concluded that these factors would have caused stress in the victim. It was his opinion to a reasonable degree of medical certainty that the cause of the victim's death was arteriosclerotic cardiovascular disease associated with mechanical stress. His autopsies revealed nothing else of significance that could have contributed to the death.

Although the defense expert, Dr. Hicks, disagreed with Beamer's conclusion, his testimony did not differ from that of Beamer as much as the defendant would suggest. Hicks, like Beamer, found no physical sign of heart failure. But he conceded that if the failure resulted from ventricular fibrillation no such evidence would necessarily be present. He testified that mechanical stress was not a medical term but conceded that

emotional stress in combination with advanced coronary arteriosclerosis, could cause heart failure. He too found such a disease present in the victim, but differed as to its severity. Like Beamer, Hicks testified that codeine of a sufficient amount could have sedated the victim and reduced stress, but he also agreed that it could not be determined how much was present at the time of the occurrence.

Defendant's own statements established the stressful nature of the robbery and attack on the victim. In those statements she confirmed that Falcone had been repeatedly struck, bound, and gagged. When he began to struggle she hit him on the head with a hammer. The State was not required to prove that the acts of defendant and those of people for whose behavior she was accountable constituted the sole and immediate cause of death. It was sufficient that they established that those acts constituted a contributory cause such that the death did not result from a source unconnected with those acts. *People v. Brown* (1978), 57 Ill. App. 3d 528, 373 N.E.2d 459.

■■ We find that the testimony of Dr. Beamer, together with defendant's own statements, was sufficient to permit the jury to conclude that defendant was accountable for the murder of Vito Falcone, and thus to reject the defense expert's conclusion to the contrary.

### III

Finally defendant contends that certain comments made by the prosecutor in final argument to the jury were prejudicial and deprived her of a fair trial.

Defendant first points to several instances in which the prosecutor, over unsuccessful defense objection, instructed the jury on accountability, robbery, murder, and the doctrine of felony-murder. In only two of these instances does the defendant contend the prosecutor incorrectly stated the law. The first instance was when the prosecutor informed the jury that:

"[The victim] was beat up and it is no way to get out of this to say that he wasn't beat up too much or to suggest that a healthier, younger, more robust person would have come out of the same exact kind of traumatic situation differently.

You take your victim as you find him because, otherwise, can any 67-year-old man with the kind of arteriosclerosis that Mr. Falcone had ever be murdered short of putting a bullet through his brain or a knife in his heart?"

We find this to be an inartfully stated but accurate explanation to the jury, based on the facts of this case, of the law that:

"* * * if a person who is enfeebled by disease is unlawfully assaulted, and an injury inflicted upon him which would not have

been mortal to a man in ordinary good health but which was mortal to him in his then [enfeebled] condition, the assailant is to be deemed, in law, guilty of unjustifiable homicide, either murder or manslaughter, as the case may be, and that though the assailant did not know the enfeebled condition of the person assaulted." *People v. Humble* (1974), 18 Ill. App. 3d 446, 451, 310 N.E.2d 51, 55, quoting *Cunningham v. People* (1902), 195 Ill. 550, 572, 63 N.E. 517, 525.

The second allegedly incorrect statement of law by the prosecutor was:

"The law says that if [defendant] was present and did not disapprove or oppose the crime, that you can consider that along with other circumstances of the crime."

This too constituted a correct statement of the law. *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411; *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.

■■ In all the instances of comment on the law by the prosecutor we have found that the comments were made as an aid in illustrating the application of the law to the facts. Although it has been held to be an improper invasion of the court's function for an attorney to instruct the jury on the law (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931; *People v. Campbell* (1973), 13 Ill. App. 3d 31, 299 N.E.2d 439), it has nevertheless been held to be proper for attorneys to give examples illustrating the application of the law to the facts. (*Boyd; Campbell;* see *People v. Pietrzyk* (1977), 54 Ill. App. 3d 738, 369 N.E.2d 1299.) How this latter function may be performed without some mention of the law to be applied is unclear. But in any event where as here the attorney correctly stated the law we can find no prejudice to the defendant and thus no basis for reversal. *People v. Bote* (1941), 376 Ill. 264, 33 N.E.2d 449.

We have examined defendant's remaining claims of error concerning the prosecutor's final argument and find that in the context of the entire argument no substantial prejudice to the defendant resulted, so that no reversible error was committed. *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.

Accordingly, for the reasons cited in this opinion, the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.