531 A.2d 302

Kenneth Barry **SMITH**

v.

**STATE of Maryland.**

**No. 1436, September Term, 1986.**

Court of Special Appeals of Maryland.

Oct. 6, 1987.

451

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Warren B. Duckett, Jr., State's Atty. for Anne Arundel County of Annapolis, on the brief), for appellee.

Argued before GILBERT, C.J., and MOYLAN, WILNER, WEANT, BISHOP, GARRITY, ALPERT, BLOOM, ROSALYN B. BELL, KARWACKI, ROBERT M. BELL, WENNER and POLLITT, JJ.

ROBERT M. BELL, Judge.

It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.

*Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886). With this admonition guiding our path, we proceed to consider the issue presented on this appeal.

Kenneth Barry Smith, appellant, was convicted at a bench trial in the Circuit Court for Anne Arundel County of assault with intent to murder, robbery with a deadly weapon, and use of a handgun in the commission of a crime of violence. His sentences for these offenses, a total of 49 years to the custody of the Division of Correction, were ordered served consecutively to a sentence he received in another case[1]. On appeal, appellant presents a single issue: Whether the trial court erred in denying his pretrial motion to suppress a sweatshirt seized in his apartment at the time of his arrest and a statement given the police subsequent to his arrest.[2]

The testimony presented at the hearing on the motion to suppress disclosed the facts surrounding appellant's arrest and the giving of his statement. Shortly after midnight on November 11, 1985, Detective Hauf and other members of the Anne Arundel County Police Department responded to the murder scene to investigate the November 9, 1985 murder of one William Conlee. As a part of that investigation, one James Costlow, the murder victim's roommate, was questioned. In the course of this questioning, Costlow provided information linking appellant to the November 5, 1985 robbery of Robert H. Massey, an employee of the Big Red service station on Baltimore-Annapolis Boulevard in Glen Burnie. Specifically, Costlow told the police that on the evening of November 5th, he dropped appellant off

---

1. Appellant was convicted in a separate trial in the Circuit Court for Anne Arundel County of first degree murder. That conviction is not before us on this appeal.

2. The statement given by appellant pertained both to the offenses charged in the case *sub judice* and the murder charge. The parties agreed that the trial court's ruling on the suppression motion would apply to both cases; we repeat, however, as noted above, *see* n. 1, that ruling as it relates to the murder charge is not before us on this appeal.

across the street from the Big Red station so that appellant could "case" the station. He then drove to a church, approximately two blocks away, to wait for appellant. When appellant did not join him within a short time, Costlow returned to the area of the Big Red station, where he observed an ambulance and law enforcement personnel on the scene. He learned at that time that the station's attendant had been shot during the course of an armed robbery of the station. When Costlow saw appellant the next day and asked him what had happened, appellant allegedly responded that "he had to shoot the guy because he came at him."

Edwin and Brenda Pearson were also questioned in connection with the murder investigation. Each made a statement implicating appellant in the Big Red holdup. According to Edwin Pearson, on the evening of the holdup, he, Costlow and a woman named Laura Knott waited in Costlow's vehicle, the "getaway" vehicle, while appellant went to rob the gas station. Although appellant was supposed to meet them at the church where they had parked, he never did. Pearson also admitted supplying the gun used by appellant in the armed robbery and to its having been returned to him by appellant on November 9, 1985, sometime after William Conlee was shot; however, Pearson reported that the gun was no longer in his possession.

Having concluded their questioning of James Costlow and the Pearsons at approximately 9:30 p.m. on November 11, 1985, the investigating officers decided to arrest the appellant for the November 5th armed robbery at the Big Red station.[3] Without attempting to obtain an arrest warrant and with Costlow accompanying them for the purpose of pointing out appellant's residence, Detective Hauf and Ser-

---

3. Although Costlow and Edwin Pearson had also provided information to the investigating officers which furnished them with probable cause to arrest appellant for the murder of William Conlee, both Detective Hauf and Sergeant Collier testified that their intention at that time was to arrest appellant only for the robbery and assault at the Big Red station.

geant Collier proceeded to the house in Glen Burnie in which appellant's apartment [3a] was located. By 10:30 p.m., at least five other Anne Arundel County police officers had arrived and positioned themselves around the house. After evacuating residents of the second floor of the house and confirming that appellant rented a first floor apartment, the police knocked on the door to appellant's apartment. When appellant answered the door and, in response to Sergeant Collier's inquiry, identified himself as "Kenny Smith," appellant was immediately placed under arrest. In effecting the arrest, Detective Hauf, Sergeant Collier and Detective Harp entered the one-room apartment, at which time, Detectives Hauf and Harp observed a sweatshirt, which "matched the description of the sweatshirt worn by the gentleman who did in fact rob the Big Red gas station," in plain view on a chair in the apartment. The sweatshirt was seized. Upon closer examination, Detective Hauf observed what appeared to be a spot of blood on the front of the sweatshirt. Then, without conducting a search of the apartment at that time, the police removed the appellant from the apartment and "secured a perimeter around it."

Appellant was taken to the police department's Criminal Investigation Division Headquarters in Crownsville. No attempt to interrogate appellant was made during that trip. At the station, appellant was taken to an interrogation room and given a cup of coffee. He was then advised of his *Miranda* [4] rights and, at 12:30 a.m. on November 12, 1985, signed a waiver of rights form. Detective Hauf testified that, at that time, appellant stated that he did not want a lawyer, but that he "wanted to finish his cup of coffee and ... to think about whether or not he wanted to speak with

---

**3a.** The record discloses only that appellant occupied a basement apartment; thus, it is unclear whether the door to appellant's apartment opened onto a public street.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

us." The detectives left the interrogation room at that point.

Detective Hauf returned to the interrogation room a short time later and asked appellant to consent to the search of his apartment. Appellant agreed and signed a consent form. The search of appellant's apartment resulted in the discovery of a wallet matching James Costlow's description of William Conlee's wallet.

Detective Harp was in the interrogation room with appellant from 1:10 a.m. until 2:15 a.m. talking to him about general matters such as "where he's been the last week, who his friends were in the area...." During this time, Detective Hauf was "in and out". At 2:15 a.m., Detective Harp asked appellant whether he was ready to make a statement, to which appellant replied that he wanted more time to think about it. Detective Harp then got appellant another cup of coffee and left him alone in the room for 15 minutes. At 2:30 a.m., appellant asked to go to the bathroom, and Detective Hauf escorted him there. When appellant returned to the interrogation room, he was joined by Detective Harp, who remained until 3:10 a.m. At that time, Detective Hauf joined them and informed appellant of the discovery of the wallet at his apartment. Appellant again indicated that he needed more time to think. He was then left alone. At 3:55 a.m., Detective Hauf entered the room and asked appellant to consent to the taking of a hair sample. Appellant agreed, signed a consent form, and permitted the police to procure the hair sample. Appellant was once again left alone in the interrogation room.

Sergeant Collier entered the interrogation room at approximately 4:30 a.m. He advised appellant of the charges, including that of first degree murder, that were being placed against him. Sergeant Collier also mentioned the possible sentences appellant could receive if convicted of those charges, including the possibility of the death penalty for the murder charge. He remained in the room with appellant until sometime between 5:30 and 6:00 a.m. During that time, he engaged appellant in what Collier de-

scribed as "a man to man, heart to heart session." Before leaving, he asked whether appellant wanted to make a statement; appellant again replied that he wanted to think about it.

At 6:05 a.m. appellant knocked on the door to the interrogation room. When Detective Hauf opened the door, appellant stated that he was ready to make a statement. Having been re-advised of his *Miranda* rights and in the presence of Detective Hauf and Sergeant Collier, appellant gave a statement in which he confessed to killing William Conlee and to the November 5th armed robbery of the attendant at the Big Red station. At the conclusion of the statement, which commenced at 6:55 a.m. and ended at 8:50 a.m. on November 12, 1985, appellant was processed and taken before a District Court commissioner in Glen Burnie.

In challenging the denial of his motion to suppress, appellant argues that his arrest was illegal and that, the evidence obtained as a result of that arrest, being tainted by the illegality, should have been suppressed. While conceding that the police had probable cause to arrest him, he points out that the police arrested him in his home without obtaining a warrant, a point that is not in dispute, and asserts that there were no exigent circumstances justifying the warrantless entry, a point also conceded by the State. Thus, appellant argues that he was arrested in violation of the Fourth Amendment to the United States Constitution. He relies heavily on *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), in both of which the Supreme Court discussed, at length, the permissible parameters of warrantless arrests.

The State, on the other hand, responds that appellant's arrest in this case need not be justified by exigent circumstances because, in effecting the arrest, the police did not violate the sanctity of appellant's home, *i.e.* gain entry with the use of force or with the consent of someone other than appellant. Proceeding on the premise that the Fourth Amendment's protection against warrantless intrusions by

the police into the home is dependent upon an individual's reasonable expectation of privacy in his home and relying on *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the State proffers that when an individual voluntarily opens his door in response to a knock, he exposes himself to public view and thus gives up his expectation of privacy. Therefore, the argument continues, since the police may make an arrest upon probable cause in any public place, *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), and since appellant, by voluntarily opening his door in response to a knock, was in a "public place" in the sense that he exposed himself to the view, speech, hearing and touch of whomever was at the door, appellant was lawfully arrested.

In *Santana,* which was decided four years before *Payton,* the police had probable cause to believe that "Mom" Santana had in her possession marked money that she had received in a controlled sale of heroin that took place only minutes earlier. Santana was standing in the doorway[5] of her house, holding a brown paper bag when the police arrived. The police having stopped their van within 15 feet of her and having exited, shouting "police" and displaying identification, Santana retreated in the vestibule. The officers followed through the open door. They caught and arrested her in the vestibule, seizing the marked money from her person. They also seized two bundles of heroin that had fallen out of the paper bag Santana had been holding. The Court of Appeals for the Third Circuit affirmed the District Court's order suppressing the evidence. The Supreme Court reversed, reasoning that Santana was in a "public" place when she stood in the open doorway of her house:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is

---

**5.** One of the arresting officers testified that "she was standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." 427 U.S. at 40 n. 1, 96 S.Ct. at 2408 n. 1.

the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351 [88 S.Ct. 507, 511, 19 L.Ed.2d 576] (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Hester v. United States,* 265 U.S. 57, 59 [44 S.Ct. 445, 446, 68 L.Ed. 898] (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in *Watson.*

427 U.S. at 42, 96 S.Ct. at 2409. Significantly, the Court went on to discuss Santana's retreat into her home. It justified the police entry into the home on the basis of "hot pursuit", pointing out that "there was ... a realistic expectation that any delay would result in destruction of evidence." *Id.,* 427 U.S. at 43, 96 S.Ct. at 2410. The Court then concluded that "a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under *Watson,* by the expedient of escaping to a private place." *Id.*

*Payton* and *Welsh* stand in stark contrast to *Santana.* In *Payton,* the Supreme Court reversed convictions in two companion cases in which the police entered private residences without a warrant, in one case, *Riddick v. New York, see* 445 U.S. at 578, 100 S.Ct. at 1375, effecting an arrest of the accused. No exigent circumstances justifying the entry were present in either case, and, in both, there was ample time for the police to have obtained a warrant. Noting that "the warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable" and that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is

directed", the Court held: "it is a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.,* 445 U.S. at 585, 586, 100 S.Ct. at 1379, 1380, quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The Court said that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382. *Payton,* therefore, patently establishes that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576, 100 S.Ct. at 1375. *See United States v. McCool,* 526 F.Supp. 1206, 1208 (M.D. Tenn.1981).

The principles announced in *Payton* were applied and elucidated in *Welsh.* At issue there was the propriety of the accused's arrest for non-criminal traffic charges by officers who entered his home in the nighttime without a warrant. Acknowledging that the gravity of the offense for which the accused is arrested is an important factor in the determination of whether exigency exits, 466 U.S. at 753, 104 S.Ct. at 2099, the Court concluded that the arrest in that case was not justified by any exigency in light of the minor nature of the offense involved. 466 U.S. at 753–54, 104 S.Ct. at 2099–2100. In discussing the applicable principles, however, the Court made it clear that "[b]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." 466 U.S. at 750, 104 S.Ct. at 2098. It stated explicitly that "no exigency is created simply because there is probable cause to believe that a serious crime has been committed," 466 U.S. at 753, 104 S.Ct. at 2099, and, further, that

exceptions to the warrant requirement are "few in number and carefully delineated," *United States v. United*

*States District Court, supra,* [407 U.S.], at 318 [92 S.Ct. at 2137], and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions, *see, e.g., United States v. Santana,* 427 U.S. 38, 42–43 [96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300] (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden,* 387 U.S. 294, 298–299 [87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782] (1967) (same); *Schmerber v. California,* 384 U.S. 757, 770–771 [86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908] (1966) (destruction of evidence); *Michigan v. Tyler,* 436 U.S. 499, 509 [98 S.Ct. 1942, 1949, 56 L.Ed.2d 486] (1978) (ongoing fire), and has actually applied only the "hot pursuit" doctrine to arrests in the home, *see Santana, supra.*

*Id.* 466 U.S. at 749, 104 S.Ct. at 2097.

As must readily be apparent, *Santana* is distinguishable from the case *sub judice* on several bases. First, Santana was *truly* voluntarily on the threshold of her home and exposed to public view when first observed by the police; appellant was not, his exposure to police view being procured by police action.[5a] Second, Santana's arrest was justifiable, as the court held, on the basis of hot pursuit, an exigent circumstance, *See Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *Dorman v. United States,* 435 F.2d 385, 392–93 (1970); no such exigency existed here. It is interesting to note in this regard, that *Santana* was cited in *Welsh,* 466 U.S. at 750, 104 S.Ct. at 2097, as one example of the "few ... emergency conditions" recognized by the Supreme Court: "hot pursuit of a fleeing felon." Finally, and perhaps most important, because her arrest followed a series of rapidly unfolding events, the police had no opportunity to obtain a

---

**5a.** Appellant was never on the threshold of his apartment even when he opened the door; he remained, at all times, within the apartment. This is yet another point of difference between *Santana* and the instant case.

warrant to effect Santana's arrest. The circumstances immediately preceding the arrest demonstrate that this is so. After having given one Patricia McCafferty money with which to purchase heroin and having received heroin from McCafferty upon her return from Santana's house, the police arrested McCafferty, who told them that Santana had the money. Armed with that knowledge, the police drove to Santana's home where the events previously recounted occurred. In the instant case, the police had ample time to obtain an arrest warrant.

The latter two distinctions, which are closely interrelated, are particularly significant because they are also the critical distinctions between *Payton* and *Santana*. This point, without mentioning *Santana,* is forcefully and persuasively made by the *McCool* Court. *See* 526 F.Supp. 1206. There, DEA agents, operating undercover, arrested one McCloud after he had sold them a quantity of qualudes. Shortly before the sale was consummated, McCool, who had come from a nearby apartment building, was observed at McCloud's car. After the sale and while in custody, McCloud informed the agents that his source was McCool. The agents discovered the apartment which McCool occupied and knocked on the door. When McCool opened the door, he was arrested. The Court, noting that the agents had probable cause for the arrest, held that the arrest was valid. It found *Payton* to be inapplicable because the arresting officers did not enter McCool's apartment. The Court went on to state, however:

> Even though the *Payton* rule is inapplicable to this case because the arrest was accomplished without an entry, the Court cautions that *a different result might follow if the agents had had an opportunity to obtain a warrant for McCool's arrest before the events recounted above. Payton* expressly limited itself to cases involving "routine arrests in which there was ample time to obtain a warrant," 445 U.S. at 583, 100 S.Ct. at 1378, a statement that clearly implies the possibility of different rules when arrests of particular individuals are not "planned." *See* 2

W. LaFave, [*Search and Seizure* § 6.1 (c)] at 391–95 [1978]. In the Ninth Circuit's *Johnson* case [6] ... the court found an unlawful "doorway arrest" on facts similar to those of the instant case, except that in *Johnson* the agents apparently could have obtained an arrest warrant before going to the defendant's home. The Court distinguished *United States v. Botero, supra,* 589 F.2d [430] at 432–33 [(9th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979)], on the grounds that *Botero* involved no subterfuge in getting the suspect to open the door. In *Botero,* the agents knocked and announced their presence, whereas in *Johnson* the agents identified themselves by ficticious names. *See* 626 F.2d at 755. In this Court's opinion, that distinction is immaterial. The important distinction between *Johnson* and *Botero,* although the Ninth Circuit did not address it, is that in *Johnson,* the agents had "ample opportunity" to obtain a warrant for Johnson before they went to his home, while in *Botero,* the arrest followed a series of rapidly unfolding events that led to the identification of a previously unknown suspect. Compare *United States v. Johnson, supra,* 626 F.2d at 754–55, with *United States v. Botero, supra,* 589 F.2d at 431.

If the facts had shown that Agent Tucker could have obtained a warrant for McCool's arrest before this episode, the Court would be inclined to hold the arrest illegal under *Payton,* despite the absence of an entry. *To uphold warrantless arrests at a person's home whenever law enforcement officers successfully obtain his presence at a door too readily allows subversion of the Payton principle. See United States v. Johnson, supra,* 626 F.2d at 757. In this Court's view, proper deference to *Payton* dictates that warrantless arrests effected even without entry in a suspect's home are generally illegal unless they are the unplanned results of field operations.

---

**6.** *United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), *aff'd* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

Cf. *United States v. Blake,* 632 F. [2d] 731, 734 (9th Cir.1980), (emphasizing that a warrant could have been obtained before arrest at suspect's home); 2 W. LaFave, *supra,* at 391–95. In most cases, this principle would allow doorway arrests only when an actual entry would have been justified under "hot pursuit" exigent circumstances. *See* generally La Fave, *supra,* at 386–88. For example, in the instant case the hot pursuit exception would have allowed Agent Tucker to enter McCool's apartment to make the arrest if McCool had not appeared at the door. *See United States v. Holland,* 511 F.2d 38 (6th Cir.1975). But once McCool appeared at his door and submitted to arrest, a nonconsensual entry was unconstitutional. . . . (footnote omitted) (emphasis supplied)

*Id.,* 526 F.Supp. at 1208–9. To like effect, *see United States v. Morgan,* 743 F.2d 1158, 1163, (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985) (No exigency where the arrest is "a planned occurrence, rather than the result of an ongoing field investigation."). *See also United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir.1986); *State v. Holeman,* 103 Wash.2d 426, 693 P.2d 89 (1985); *State v. Morse,* 125 N.H. 403, 480 A.2d 183, 187 (1984); *People v. Levan,* 62 N.Y.2d 139, 476 N.Y.S.2d 101, 464 N.E.2d 469 (1984).

*State v. Morse, supra,* distinguishes *Santana* on the equally relevant basis that Santana was on the threshold of her home *"when the police arrived,* and not because the police procured her appearance by knocking on her door." (emphasis in original) *Id.,* 480 A.2d at 186. In *Morse,* the police acting on probable cause that Morse had committed a rape, but without having obtained a warrant, went to Morse's motel room and knocked at the door. Morse, who was nude, answered the door and the police identified themselves, whereupon Morse said, "I guess l know why you are here" and tried to shut the door. This attempt was thwarted and the police entered the room. Finding the arrest illegal, the Court explained:

"the 'exigency' in *Santana* arose by chance, as a result of the defendant's being in her doorway when the police arrived. In this case, however, any exigency arising from the defendant's retreat was created solely by the police action in knocking on the defendant's door."

480 A.2d at 186. *See also State v. George*, 210 Neb. 786, 317 N.W.2d 76, 79–81 (1982); *Morgan*, 743 F.2d at 1166–67; *Johnson*, 626 F.2d at 757; *McCool*, 526 F.Supp. at 1209.

The fact that an accused may be exposed to police view when he opens the door in response to their knock does not in any manner vitiate the *Payton* rule. In *People v. Levan*, *supra*, the Court of Appeals of New York found illegal a warrantless arrest of the accused in his apartment even though the police entered the apartment only after the accused, who had opened the door in response to his neighbor's knock, was observed through the open door. The Court referred to *Riddick*, the companion case to *Payton*, in which a small child opened the door. It pointed out that the Supreme Court did not find the fact that Riddick had been seen through an open door before the arrest to be significant or, in any way, to justify the entry into Riddick's apartment. 476 N.Y.S.2d at 103, 464 N.E.2d at 471. *See also United States v. Johnson*, 626 F.2d at 757. This analysis applies equally to the facts *sub judice*.

What we have said makes it obvious that, in reviewing the legality of a warrantless arrest effected in a private residence, the presence or absence of exigent circumstances, which necessarily involves an assessment of the opportunity of the police to have obtained a warrant prior to invading the residence to make the warrantless arrest, is a highly relevant factor to be considered by a reviewing court and, indeed, is critical, analytically, to that determination. *McCool*, 526 F.Supp. at 1209. That appellant was arrested inside his apartment is beyond dispute; police testimony conceded that point. *See Johnson*, 626 F.2d at 757 ("[I]t is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home."). Nor is the fact that the police

entered the apartment in effecting the arrest open to challenge, that fact having also been conceded in the police testimony. Moreover, there is absolutely no contention, nor could there be, that appellant consented to the police entry. When the chronology of the events surrounding appellant's arrest is considered in light of these concessions, it is clear that the police had ample time and opportunity to obtain a warrant; thus, appellant's arrest was not justified by any exigent circumstances.

By approximately 9:30 p.m. on November 11, the police had probable cause to arrest appellant for the Big Red gas station robbery, which had occurred some six days earlier. Shortly after 9:30 p.m., they went to appellant's apartment building for the express purpose of arresting appellant for that robbery. By 10:30 p.m., at least seven officers were "positioned around" the building and between then and 11:30 p.m., when the arrest was made, the other residents of the building were evacuated from the building. Other than describing the police actions leading to appellant's arrest—the development of probable cause and the preparations for the arrest—the State offered only the testimony of Sgt. Collier as bearing on the exigency which might have justified the warrantless arrest. Incredibly, Sgt. Collier testified that, despite the presence of at least seven officers surrounding the house and the lapse of some two hours from the time probable cause was developed, he did not obtain a warrant because he "didn't have the time to do that and [because he] didn't have the manpower to do that." Patently, that testimony established neither exigent circumstances justifying a warrantless arrest, nor the absence of an opportunity for the police to have obtained a warrant. In any event, at oral argument, the State conceded that appellant's arrest could not be justified by exigent circumstances or a lack of opportunity to obtain a warrant since the facts disclosed the existence of neither.

We hold that *Payton*, rather than *Santana*, controls the resolution of the issue before us. And because no exigent circumstances justified the warrantless entry into appel-

lant's home, there being ample opportunity for the police to have obtained a warrant, we further hold that the police invaded appellant's home in order to make a routine felony arrest, rendering appellant's arrest illegal.

In so holding, we are, to be sure, aware that courts across the country have had difficulty reconciling *Santana* and *Payton* with respect to warrantless doorway arrests and that some courts have held that the police may effect a warrantless arrest when an individual voluntarily opens his door in response to a police officer's knock. *E.g., People v. Schreiber*, 104 Ill.App.3d 618, 60 Ill.Dec. 417, 421–22, 432 N.E.2d 1316, 1320–21 (1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1214, 75 L.Ed.2d 452 (1983) (arrest of defendant at entrance of her room, after she voluntarily opened door in response to police officer's knock, held lawful where "there was no evidence to suggest that subterfuge was used or that defendant was in any manner coerced into opening the door and thus exposing herself to public view"); *State v. Howard*, 373 N.W.2d 596, 598 (Minn.1985) (*"Payton* does not prohibit a nonexigent warrantless arrest initiated at the threshold of a suspect's residence if the suspect voluntarily opens the door in response to knocking by the police"); *cf. Byrd v. State*, 481 So.2d 468, 472 (Fla.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986) [7] (arrest

---

7. It is interesting that the majority opinion in *Byrd* explained its holding as follows:

In so holding [that appellant's arrest at the threshold of his residence was the result of a consensual entry] we choose to accept the view of those courts which have found entries to be consensual where there is no forced entry or deception, *and when* the defendant knows who is asking for admission and then opens the door. (emphasis supplied)

*Id.,* 481 So.2d at 472. Moreover, the dissent astutely observed:

If *Payton* is to have any meaning, its application cannot be made to depend on the vagaries of how suspects respond to the call of the police at the entry to the home. The police do not know ahead of time how the suspect will respond. If there is no consent to entry or voluntary giving up of the protective bounds of the home, and the arrest to be made is a "routine" one, then the police must come away empty-handed. It is much better police practice to get an

of appellant at threshold of his residence was the result of a consensual entry, where appellant knew the arresting officer, who had identified himself and requested admission, and appellant voluntarily opened door and stepped back to admit officers); *United States v. Holland,* 755 F.2d 253, 257 (2nd Cir.1985), (Reasoning that *Payton* did not "broaden the definition of 'home' so as to include ... the entrance-way to a common hallway", arrest held legal where, in response to the ringing of his door bell, the accused walked down a common hallway and opened the door to an officer whom he knew); *United States v. Carrion,* 809 F.2d 1120 (5th Cir.1987) (An accused arrested upon opening the door to his hotel room in response to police knock had no expectation of privacy to be protected, hence arrest lawful.) [8] *See also United States v. Mason,* 661 F.2d 45 (5th Cir.1981) (same); *State v. Patricelli,* 324 N.W.2d 351 (Minn.1982) (Defendant came to door when called by another man who had answered the police knock.) *People v. Burns,* 200 Colo. 387, 615 P.2d 686 (1980). *See generally* 2 W. LaFave, *Search and Seizure* § 6.1(e), 587–595 (2d ed. 1987).

These cases proceed on a false premise, one that fails to recognize or, at least, fails to acknowledge, the substantial distinctions between *Santana* and *Payton.* They focus myopically upon one factor—an expectation of privacy [9]—concomitantly, ignoring the warrant requirement as

---

arrest warrant before even approaching a suspect's home to make a "routine" felony arrest.
481 So.2d at 477.

**8.** The facts in *Carrion* are very close to those in *McCool* and *Santana:* Carrion's co-defendant, who transported the narcotics for the transaction, was arrested shortly after the narcotics transaction had taken place. Thus, his arrest, occurring, as it did, at the end of a series of rapidly unfolding events, *see McCool, supra,* was justified by exigent circumstances and the absence of an opportunity for the police to get a warrant.

**9.** The rationale that one who answers his door in response to a knock, because he exposes himself to public view, voluntarily gives up any expectation of privacy which he had while the door was closed causes one to contemplate what result would obtain if, instead of simply an

enunciated in *Payton,* and, thus, refusing to require compliance with its dictates. Moreover, adopting their reasoning would expand the warrant exception, which allows warrantless arrests in private residences only if exigent circumstances exist, to include warrantless arrests in the absence of exigent circumstances, and would permit the exception, in that form, to swallow the rule. These cases are singularly unpersuasive.

Having concluded that appellant was illegally arrested, it follows that the seizure of the sweatshirt by the police at the time of that arrest was the fruit of that illegality. *See In Re Owen F.,* 70 Md.App. 678, 688, 523 A.2d 627 (1987) ("... [S]earches and seizures incident to an illegal arrest are necessarily unreasonable, *Stanley v. State,* 230 Md. 188, 192, 186 A.2d 478 (1962), and no evidence secured from such a search and seizure may be introduced into evidence, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)...."). Appellant's motion to suppress the sweatshirt should have been granted. The denial of the motion requires us to reverse appellant's convictions and remand the case to the circuit court for a new trial. In so holding, we, of course, reject the State's argument that the doctrine of inevitable discovery, *see Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), renders the sweatshirt admissible. We agree with appellant that application of that doctrine to the facts *sub judice* "would ... read out of the Constitution the requirement that the police follow certain protective procedures, in this case, the warrant requirement of the Fourth Amendment [,]" *Commonwealth v. Benoit,* 382 Mass. 210, 415 N.E.2d 818, 823 (1981),

---

open door, there was a screen door which the accused did not open or if, instead of seeing the accused through an open door, the police viewed him through an open window: would the police be permitted to enter the apartment to effect the arrest of an accused who refused to come outside in response to an officer's announcement that he is under arrest? The State candidly acknowledged at oral argument that entry under these and similar hypothetical situations may not be constitutionally warranted.

thus rendering "every warrantless nonexigent [arrest] automatically ... legitimatized by assuming the hypothetical alternative that a warrant had been obtained." *People v. Knapp*, 52 N.Y.2d 689, 439 N.Y.S.2d 871, 876, 422 N.E.2d 531, 536 (1981). *See* 4 W. LaFave, *Search and Seizure*, § 11.4(a), 382 (2nd ed. 1987) in which the commentator states:

> Because one purpose of the exclusionary rule is to deter [unconstitutional] shortcuts, the "inevitable discovery" rule should be applied only when it is clear that "the police officers have not acted in bad faith to accelerate the discovery" of the evidence in question. If the rule were applied when such a shortcut was intentionally taken, the effect would be to read out of the Fourth Amendment the requirement that other, more elaborate and protective procedures be followed. (footnote omitted)

■ Since we have reversed appellant's convictions and ordered a new trial on the basis of the trial court's error in admitting the sweatshirt, we need not address appellant's arguments concerning the admissibility *vel non* of his statement; however, because the issue may arise on retrial, we offer the following observation. Our holding that the arrest was illegal does not automatically or even necessarily require suppression of appellant's statement. *See Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *Michigan v. Tucker*, 417 U.S. 433, 449–50, 94 S.Ct. 2357, 2366–67, 41 L.Ed.2d 182 (1974); *Ryon v. State*, 29 Md.App. 62, 71, 349 A.2d 393 (1975), *aff'd*, 278 Md. 302, 363 A.2d 243 (1976). The test to be applied to the determination whether the statement was "sufficiently an act of free will to purge the primary taint [of the illegal arrest]", *Brown*, 422 U.S. at 597, 95 S.Ct. at 2258, quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963), was elucidated in *Ryon:*

> "(1) The Fourth Amendment exclusionary rule applies equally to statements and tangible evidence obtained following an illegal arrest or an otherwise illegal search and seizure.

(2) Such statements are not rendered inadmissible simply because of the illegal arrest or unreasonable search and seizure.

(3) Such statements are not rendered admissible simply because the *Miranda* warnings were fully given. ·

(4) Admissibility of such statements, *vel non,* must be answered on the facts of each case, upon consideration of:

    (a) the voluntariness of the statement, which is a threshold requirement;

    (b) compliance with the *Miranda* safeguards, which is important in determining whether the statements were obtained by exploitation of the illegal conduct;

    (c) other relevant factors, such as

        (i) the temporal proximity of the arrest and the confession;

        (ii) the presence of intervening circumstances;  and

        (iii) 'particularly, the purpose and flagrancy of the official misconduct.' "

29 Md.App. at 71–72, 349 A.2d 393.  This analysis must guide any ruling the trial judge might make concerning the statement's admissibility.

JUDGMENTS REVERSED, CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR NEW TRIAL.

COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.

KARWACKI, Judge, dissenting.

I respectfully dissent from the Court's holding that police officers, possessing probable cause to believe that the appellant had participated in the murder of William Conlee and the armed robbery of Robert H. Massey, could not arrest him without a warrant in the absence of exigent circumstances when the appellant voluntarily opened the door to his apartment in response to their knock. *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) should control the disposition of this case rather

than *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

While the Fourth Amendment protects against warrantless intrusions into the home by the police, the basis for that protection is the individual's reasonable expectation of privacy in his or her home. When an individual voluntarily opens the door in response to a knock, that expectation of privacy is relinquished. Under such circumstances, I would hold that the police may effect a warrantless arrest upon probable cause as is permitted in any public place. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (holding that a nonexigent warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment).

In *Santana* the police had probable cause to believe that "Mom" Santana had in her possession marked money that she had received in a sale of heroin. When the officers went to Santana's home, they saw her standing in the doorway of the house with a brown paper bag in her hand. After shouting "police" and displaying identification, the officers approached the house, but Santana retreated into the vestibule. The officers followed her through the open door, catching her in the vestibule, whereupon they seized two bundles of heroin that had fallen out of the paper bag and the marked money which had been in Santana's pockets. In reversing the decision of the Court of Appeals for the Third Circuit, which had upheld a district court's order granting Santana's motion to suppress that evidence, the Supreme Court concluded that Santana was in a "public" place when she stood in the open doorway of her house:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment

protection." *Katz v. United States,* 389 U.S. 347, 351 [88 S.Ct. 507, 511, 19 L.Ed.2d 576] (1967). *She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. Hester v. United States,* 265 U.S. 57, 59 [44 S.Ct. 445, 446, 68 L.Ed. 898] (1924). Thus, when the police, who concededly had probable cause to do so so, sought to arrest her, they merely intended to perform a function which we have approved in *Watson.* (Emphasis supplied.)

427 U.S. at 42, 96 S.Ct. at 2409, 49 L.Ed.2d at 305. Because the arrest of Santana had been set in motion in a public place, the Court held that Santana's act of retreating into her house did not invalidate the otherwise proper arrest. *Id.* at 42–43, 96 S.Ct. at 2409–10, 49 L.Ed.2d at 305–06.

In terms of the Supreme Court's analysis in *Santana,* the appellant was in a "public" place after he voluntarily opened his door in response to a knock. Appellant certainly knew that he was exposing himself to the "view, speech, hearing, and touch" of whoever was at the door. Since the record does not reflect that he was aware of who was knocking at his door, there is no suggestion that he was intimidated into opening the door by the presence of police officers by anything they said or did. Compare *United States v. Al-Azzawy,* 784 F.2d 890, 893 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986) (where police surrounded appellee's trailer with weapons drawn and ordered him through a bullhorn to leave the trailer, arrest occurred inside trailer since appellee "did not voluntarily expose himself to [police officers'] view or control outside his trailer but only emerged under circumstances of extreme coercion"); *United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985) (defendant did not voluntarily expose himself to warrantless arrest where police surrounded his mother's home, flooded it with spotlights, and summoned him to the door "with the blaring call of a bullhorn"); *Scroggins v. State,* 276 Ark. 177, 633 S.W.2d 33,

35–37 (1982) (arrest just outside motel room held illegal where defendant opened door after police officers knocked and identified themselves, and defendant stepped outside room at officers' request while they held a gun on him); *but see Rodriguez v. State,* 653 S.W.2d 305, 307 (Tex.Crim.App. 1983) (appellants' act of opening door to police officer who had knocked on door, shouting "Police Officer," exhibited "intentional relinquishment of any subjective expectation of privacy"). Furthermore, the appellant does not assert that he was lured into opening the door through some ruse or deception on the part of the police. Compare *United States v. Johnson,* 626 F.2d 753, 755–57 (9th Cir.1980), *aff'd on other grounds,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) (defendant did not voluntarily expose himself to warrantless arrest by opening his door to federal agents who had misrepresented their identities). The mere fact that the police officers obtained the appellant's presence at the door by knocking on it did not render his act of opening the door involuntary, "there being no right of a citizen, constitutional or otherwise, which immunizes him from having a policeman knock on his door during reasonable evening hours." *Mullaney v. State,* 5 Md.App. 248, 257, 246 A.2d 291 (1968), *cert. denied,* 252 Md. 732 (1969).

The voluntary act of the appellant in the case *sub judice* in exposing himself to "public view, speech, hearing, and touch" is significant when measured against the factual predicates for the Supreme Court's decision in *Payton v. New York, supra.* The Court there was reviewing two warrantless entries into residences. In the first case police officers, possessing probable cause to arrest one Riddick for armed robbery, knocked on the door of Riddick's home. When Riddick's young son opened the door, the officers saw Riddick sitting in bed covered by a sheet. They entered the house and placed him under arrest. In the second case police officers, possessing probable cause to arrest one Payton for murder, proceeded to his apartment. When there was no response to their knock at the apartment door, they forcibly broke down the door and entered the apart-

ment. In neither case before the Court in *Payton* had the arrestee voluntarily opened the door of his residence and exposed himself to "public view, speech, hearing and touch."

In testing the reasonableness of the seizure of the appellant's person without a warrant under the Fourth Amendment, the focus should be on his reasonable expectation of privacy at the site of the arrest. When he voluntarily placed himself in the open doorway of his home, he knowingly entered a public place where he was subject to a nonexigent warrantless arrest. *United States v. Carrion*, 809 F.2d 1120, 1127–28 (5th Cir.1987), *United States v. Mason*, 661 F.2d 45, 47 (5th Cir.1982); *People v. Burns*, 200 Colo. 387, 615 P.2d 686, 688–89 (1980); *Byrd v. State*, 481 So.2d 468, 471–72 (Fla.1985); *State v. Howard*, 373 N.W.2d 596, 598–99 (Minn.1985); *People v. Graves*, 135 Ill.App.3d 727, 90 Ill.Dec. 516, 482 N.E.2d 223 (1985); *People v. Patton*, 122 Ill.App.3d 46, 77 Ill.Dec. 547, 460 N.E.2d 851 (1984); *People v. Cox*, 121 Ill.App.3d 118, 76 Ill.Dec. 632, 634, 459 N.E.2d 269, 271 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed. 296 (1984); *People v. Schreiber*, 104 Ill.App.3d 618, 60 Ill.Dec. 417, 421–22, 432 N.E.2d 1316, 1320–21 (1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1214, 75 L.Ed. 452 (1983).

Judge ROSALYN B. BELL has authorized me to state that she concurs with the views expressed herein.