481 So.2d 468 (1985)
Milford Wade BYRD, Appellant,
v.
STATE of Florida, Appellee.
No. 62545.
Supreme Court of Florida.
November 14, 1985.
Rehearing Denied February 6, 1986.
*469 James Marion Moorman, Public Defender, W.C. McLain, Asst. Public Defender, Chief, Capital Appeals, and Karla J. Staker, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Jim Smith, Atty. Gen., and Theda R. James and Katherine V. Blanco, Asst. Attys. Gen., Tampa, for appellee.
PER CURIAM.
The appellant, Milford Wade Byrd, was convicted of first-degree murder. The trial judge imposed the death sentence in accordance with the jury's advisory sentence recommendation. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
For the reasons expressed, we affirm appellant's murder conviction and the imposition of the death penalty.
Appellant and his wife, Debra, managed a motel in Tampa. Debra's body was found on the floor of the motel office at approximately 7:00 a.m. on October 13, 1981. An autopsy revealed that Debra had suffered four non-fatal scalp lacerations, four non-fatal gunshot wounds, and scratches and bruises on the neck. The pathologist determined that the cause of death was strangulation and that death had occurred between 9:00 p.m. on October 12 and 3:00 a.m. on October 13.
During interrogation on the morning of October 13, appellant told police that, on the night of the murder, he had gone to a gym and then to two bars. He stated that he returned home to the motel around 6:45 a.m., found his wife's body and called the police. Later that morning appellant requested that a desk clerk at the motel contact a life insurance company with reference to an insurance policy on Debra's life. Appellant was the sole beneficiary of the $100,000 policy. Five days later, on October 19, appellant personally carried a copy of Debra's death certificate to the insurance company and twice inquired as to how long settlement of the policy claim would take.
Ronald Sullivan, a resident of the motel, was arrested for violation of parole on October 27 and was subsequently charged with Debra's murder. After interviewing Sullivan the police decided that they had probable cause to arrest appellant. At 2:30 a.m. on October 28, the police arrived at the appellant's residence at the motel where *470 they awoke appellant and arrested him for the first-degree murder of his wife. Although the arresting officers had no arrest warrant when they went to appellant's residence, it is undisputed that they had probable cause to arrest appellant. One of the arresting officers knocked on appellant's door, identified himself to appellant through a window, and mentioned that he had previously spoken to him with regard to the death of appellant's wife. After a few seconds appellant opened the door and stepped back. The detective then took a step inside, placed appellant under arrest for the murder of his wife, and advised him of his rights. In the motel room with appellant was his girlfriend, who was asked by the officers to accompany them to the police station. The woman voluntarily accompanied the officers.
At the police station appellant was again advised of his rights. He signed a written waiver of his rights at 2:55 a.m. Appellant neither admitted nor denied involvement in the crime until approximately 4:40 a.m. when he told the police he would tell them the truth if he could speak privately with his girlfriend. The detectives allowed appellant to spend some time alone with his girlfriend and, when questioning resumed, appellant's girlfriend re-entered the interrogation room and appellant gave a confession.
Appellant testified at trial that, at the time of his arrest, the arresting detectives said they had an arrest warrant. He stated that he opened the door and backed up as the detective stepped forward and arrested him.
When questioned about the murder, appellant stated that he had fallen in love with his girlfriend and that his wife had denied his request for a divorce. He confessed that he had offered Sullivan and Endress, Sullivan's roommate at the motel, five thousand dollars apiece to murder his wife. He also stated that the murder was planned to look like a robbery. Appellant denied, however, that he was present when the murder occurred. After this initial confession, appellant requested permission to use the telephone in the homicide squad room to call his father. Three police officers overheard this conversation and testified that appellant informed his father that, although he had not committed the murder, he had had it done.
Shortly after the telephone call, appellant signed a consent-to-search form for the search of a motel storage room. During the search of the room, detectives found a hacksaw, drill, solder, and copper and brass filings. Evidence was submitted at trial which indicated that Sullivan and Endress had fashioned a silencer for the murder weapon in the storage room.
Appellant retracted his initial confession two days after having given it and moved to suppress both the confession and the consent to search. The trial court, finding that the confession was voluntarily given and that the consent was valid, denied the motions.
In exchange for a negotiated plea, Sullivan testified against appellant on behalf of the state. Sullivan, who was charged with first-degree murder, testified that the state had offered him a term of probation in exchange for his truthful testimony. Sullivan stated that appellant had approached Endress and himself about having Debra killed. He also testified that he, Endress, and appellant were present when Debra was murdered; that Endress shot Debra several times and hit her with the gun; and that the three, in turn, had choked her.
The defense produced testimony from three county jail inmates concerning inconsistent statements made by Sullivan while he was in jail. The inmates offered three different statements allegedly given by Sullivan which alternatively placed the blame for Debra's murder on himself, Endress, and unknown armed robbers. A defense motion for a mistrial, based on the state's method of impeaching one of the inmates, was denied.
Appellant testified on his own behalf and denied complicity in the crime. He stated that he had been at two bars the night of the murder. Appellant also testified that his initial confession was given only because *471 of concern for his girlfriend. Attempts to expedite the insurance policy on Debra's life, he explained, were only to enable him to pay the funeral expenses.
At the conclusion of the guilt phase of the trial, the jury returned a verdict of guilty of first-degree murder.
During the sentencing phase of the trial, the defense presented two witnesses, appellant and his father. Appellant testified concerning his relationship with his girlfriend subsequent to his wife's death. His father testified as to appellant's non-violent nature and appellant's relationship with his wife. The jury returned an advisory recommendation of the death penalty.
After the jury had given its recommendation, the trial judge heard testimony from two experts in the field of psychiatry concerning appellant's mental state at the time of the crime. The witnesses stated that appellant was not under the influence of any extreme mental or emotional disturbance, was not acting under the substantial domination of any other person, was not acting under extreme duress, and was not suffering any mental illness.
The trial judge agreed with the jury's recommendation and imposed the death sentence. The judge found three aggravating circumstances and one mitigating circumstance. The judge specifically found that the crime was committed for pecuniary gain in that appellant murdered his wife so that he could collect the proceeds of the $100,000 life insurance policy; that the murder was especially heinous, atrocious, and cruel; and that the acts of appellant exhibited the highest degree of calculation and premeditation. As a mitigating circumstance, the judge found that appellant had no significant history of criminal activity.

Guilt Phase
Appellant contends that his conviction should be vacated because: (1) his confession was erroneously admitted because it was not shown to have been voluntarily given and because it was the fruit of an unlawful, warrantless arrest at his residence without compliance with Florida's knock-and-announce statute, section 901.19(1), Florida Statutes (1981); (2) evidence obtained from the warrantless search of a storeroom was improperly admitted since the consent to search was not voluntarily given; (3) the consideration promised to a key state witness was not fully disclosed to the jury; and (4) the trial court failed to grant a mistrial based on the prosecution's improper cross examination of a witness. We find that the evidence is clearly sufficient to sustain this conviction and that none of the asserted errors require reversal.
A determination of the validity of appellant's confession requires a discussion of the appellant's arrest as it relates to the United States Supreme Court decision in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In Payton and its companion case, Riddick v. New York, law officers, after establishing sufficient probable cause to arrest the defendants, entered the residences of the individuals to arrest them without first obtaining warrants. In both instances, incriminating property was seized from the premises and, in Payton, the defendant was also arrested. The United States Supreme Court held that the language of the fourth amendment applied to both the seizure of persons and the seizure of property. The Court, citing United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), recognized that a warrantless arrest in a public place was proper, but stated that, with regard to the home or residence, the "Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382.
In the instant case, it is unrefuted that the officers had probable cause to arrest the defendant. In addition, it is conceded that there were no exigent circumstances and that the officers did not secure a warrant to arrest appellant at his place of residence. How the entry occurred, therefore, is critical to a determination of whether the arrest was legal and whether the *472 subsequent confession was admissible. The record reflects that the officers knocked on the door and the appellant then looked out the window. The officer, who had previously talked to appellant about his wife's death, identified himself and showed his police identification. Appellant then voluntarily opened the door and was immediately arrested at the threshold, although he was actually inside the door.
There is no question that if appellant had been asked to step outside and had complied, the warrantless arrest outside the room would have been proper and Payton would not apply. A significant question arises, however, when a warrantless arrest occurs at or just within the threshold of a residence. We find that the arrest of appellant at the threshold of his residence was the result of a consensual entry. The appellant knew the arresting officer, who had identified himself and requested admission. Appellant voluntarily opened the door and stepped back to admit the officers, at which point he was arrested at the threshold. There is no evidence of deception or forced entry on the part of the police officers. In our view, the appellant consented to the law enforcement officers' entry into the threshold area by voluntarily opening the door, stepping back, and standing in the threshold after knowing who was present; therefore, this was a valid warrantless arrest. In so holding, we choose to accept the view of those courts which have found entries to be consensual where there is no forced entry or deception, and when the defendant knows who is asking for admission and then opens the door. In our opinion, an entry under those circumstances is consensual, at least with respect to the area immediately surrounding the threshold or vestibule entrance of the residence, particularly where the defendant makes no objection. See United States v. Griffin, 530 F.2d 739 (7th Cir.1976); United States v. Sheard, 473 F.2d 139 (D.C. Cir.1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973); Robbins v. Mackenzie, 364 F.2d 45 (1st Cir.), cert. denied, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966); Jones v. State, 409 N.E.2d 1254 (Ind. App. 1980); State v. McLain, 367 A.2d 213 (Me. 1976); cf. United States v. Lace, 669 F.2d 46 (2d Cir.), cert. denied, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982); Davis v. State, 275 Ark. 264, 630 S.W.2d 1 (1982); People v. Thompson, 93 Ill. App.3d 995, 49 Ill.Dec. 468, 418 N.E.2d 112 (1981), cert. denied, 458 U.S. 1109, 102 S.Ct. 3490, 73 L.Ed.2d 1371 (1982); State v. Radford, 30 Or. App. 807, 568 P.2d 692 (1977); Duffield v. Peyton, 209 Va. 178, 162 S.E.2d 915 (1968).
There is also a line of cases which have held, in situations analogous to that presented here, that an arrest at or in the threshold of a residence does not involve an entry and, therefore, does not implicate Payton considerations. These cases have characterized the threshold area as a public place wherein a warrant is not required to effectuate a valid arrest. See United States v. Mason, 661 F.2d 45 (5th Cir.1981); People v. Morgan, 113 Ill. App.3d 543, 69 Ill.Dec. 590, 447 N.E.2d 1025 (1983); People v. Haynes, 89 Ill. App.3d 231, 44 Ill.Dec. 510, 411 N.E.2d 876 (1980), cert. denied, 452 U.S. 907, 101 S.Ct. 3034, 69 L.Ed.2d 408 (1981); State v. Patricelli, 324 N.W.2d 351 (Minn. 1982); cf. United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); United States v. Botero, 589 F.2d 430 (9th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); People v. Burns, 200 Colo. 387, 615 P.2d 686 (1980); Finch v. State, 644 P.2d 1378 (Okla. Crim. App.), cert. denied, 459 U.S. 990, 103 S.Ct. 347, 74 L.Ed.2d 386 (1982).
Although we find that appellant's arrest was proper under the factual circumstances of this case, we note that, even if the arrest was improper, the confession was not so tainted as to be inadmissible. We reach this conclusion because appellant knew the officers, had talked to them before his arrest, was advised of his rights at his residence and at the police station, and also signed a "consent to be interviewed" form and indicated to police that he wanted to give a statement. In addition, appellant was afforded time alone with his girlfriend *473 to discuss his predicament before he actually gave the confession.
Appellant's assertion that the confession was erroneously admitted because the arresting officers failed to comply with the knock-and-announce statute is without merit. The record shows no violation of the Florida knock-and-announce statute. From our complete review of the record, we find there is sufficient evidence to sustain the trial court's finding that all of the statements made by appellant were voluntarily given.
With regard to appellant's consent to search the storeroom at the motel, we find that the record supports a finding that this consent was voluntarily given. We note that the voluntariness of the consent was never presented to the trial judge although there was a motion to suppress the results of the search on other grounds.
Appellant's third point, that the consideration promised a key state witness was not fully disclosed to the jury, is also without merit. We find no reversible error regarding the state's questioning of Sullivan, appellant's codefendant, concerning the agreement made with him by the state. The agreement, of which defense counsel had full knowledge, allowed Sullivan to plead guilty to second-degree murder and receive a term of probation. In addition, the agreement provided for the dismissal of unrelated grand-theft and armed-robbery charges. The latter part of the agreement, concerning the dismissal of the unrelated charges, was, in fact, referred to by defense counsel during the voir dire examination of the jury. At trial, the state asked Sullivan what crime he was initially charged with, to which he answered first-degree murder. The state then asked what had been offered during plea negotiation. Sullivan responded that he was to give full and truthful testimony to receive some term of probation. Although Sullivan did not bring out the fact that two other charges were dropped, counsel for the defendant was fully aware of the agreement and could have elicited that portion of the agreement on cross examination. In addition, the jury fully knew that Sullivan was initially charged with first-degree murder and had bargained for a term of probation. Thus, the jury knew that he had received substantial consideration for his testimony and was able to judge Sullivan's credibility accordingly. We find no prejudicial error.
With regard to appellant's fourth point, we find that the trial judge did not commit prejudicial error in denying a motion for mistrial after he had sustained a defense objection to an improper question asked during the cross-examination of one of the defendant's key witnesses. We find that the evidence sustains the trial judge's exercise of his discretionary authority to deny a mistrial under these circumstances. See Wilson v. State, 436 So.2d 908 (Fla. 1983); Salvatore v. State, 366 So.2d 745 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979).

Sentencing Phase
Appellant contends that his sentence should be vacated and a new sentencing trial granted because the trial court: (1) failed to instruct the jury on all statutory aggravating circumstances and only gave those supported by the evidence; (2) erroneously found that the homicide was committed for pecuniary gain; (3) erroneously found that the murder was heinous, atrocious, and cruel; (4) erroneously considered, as nonstatutory aggravating circumstances, the appellant's lack of remorse and his continued danger to the community; and (5) failed to appropriately discuss, in the sentencing order, the nonstatutory mitigating factors, indicating that the trial judge failed to consider such evidence in the penalty phase. We find no merit in the appellant's contentions but will discuss each briefly.
With regard to the first point, it is clear that the trial judge instructed the jury on only the aggravating circumstances supported by the evidence. We do not find that this was error. We further note that the trial judge properly instructed the jury under the Florida Standard Jury Instructions *474 and that the appellant made no objection to the instructions, either before or after they were given to the jury. Finally, there has been no showing as to how the appellant was prejudiced by the trial court's failure to instruct on aggravating circumstances that were not supported by the evidence.
With respect to appellant's second point, we find that the trial court correctly found that the homicide was committed for pecuniary gain. The record reflects that there was sufficient evidence to establish this aggravating factor beyond a reasonable doubt. We reject appellant's contention that the homicide was committed solely because of a love triangle involving himself, his wife, and his girlfriend.
With regard to appellant's third contention, we find that the record supports the finding that this murder was heinous, atrocious, and cruel. Sullivan, appellant's codefendant, testified that the appellant participated in the murder, and the record is unrefuted that the victim sustained four gunshot wounds and four deep scalp lacerations, none of which were fatal. After suffering these wounds, the victim ultimately died from strangulation. All of these circumstances justify the finding that this murder was heinous, atrocious, and cruel.
We summarily reject the assertion that the trial judge considered nonstatutory aggravating circumstances, specifically, appellant's lack of remorse and continued danger to the community, in imposing sentence. We do not find that these factors entered into the final determination made by the trial judge.
With regard to the final assertion, which concerns alleged nonstatutory mitigating factors, we find that the evidence reflects that appellant had a full opportunity to present all mitigating circumstances. The trial judge did, in fact, consider the appellant's lack of a prior criminal history as a mitigating factor. We find that it was within the province of the court to decide, on the basis of the record, the appropriate aggravating and mitigating circumstances. We also find that the court's conclusion, that the aggravating circumstances outweigh the mitigating circumstances, is justified by this record.
We have also reviewed the appellant's sentence and have considered it in light of similar cases to determine whether the death sentence is appropriate. This was a pre-planned homicide of a family member and the death sentence imposed in this case is consistent with the death sentence imposed in Zeigler v. State, 402 So.2d 365 (Fla. 1981). We find no error in the imposition of the death penalty in this case.
For the reasons expressed, we affirm the appellant's conviction and the imposition of the death sentence.
It is so ordered.
OVERTON, McDONALD, EHRLICH and SHAW, JJ., concur.
BOYD, C.J., dissents with an opinion.
ADKINS, J., dissents.
BOYD, Chief Justice, dissenting.
I respectfully dissent to the Court's construction of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The narrow interpretation of Payton seems inconsistent with that decision when considered in the context presented by the facts of this case. The arrest in this case can only be legally justified by a finding that there were exigent circumstances inhering in the situation to render the warrantless arrest reasonable. However, I conclude that there were no exigent circumstances to justify an arrest without a warrant, so the arrest was illegal under Payton.
Payton v. New York held that the fourth amendment is violated when police officers, having probable cause to arrest a suspect for commission of a felony, enter the suspect's home to effect the arrest without an arrest warrant in "routine" circumstances. The opinion makes clear that by describing the arrests in question there as "routine" felony arrests, the Court meant to exclude *475 from its consideration arrests accompanied by the kind of exigent circumstances that would justify an arrest without a warrant.
The Payton decision represented a significant change in the common-law rule followed and codified in many states and previously understood to be consistent with and not violative of constitutional principles. Before Payton, law enforcement officers with probable cause to believe that a person had committed a felony could arrest the person without a warrant and could go to the suspect's home for that purpose even if they had plenty of time to obtain an arrest warrant before doing so. Upon making their presence, identity and purpose known, such officers, receiving no answer and reasonably believing the suspect to be inside, were authorized to break the close and enter the residence if reasonably necessary to effect the arrest. See, e.g., Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); §§ 901.15, 901.19, Fla. Stat. (1979).
In Payton, police officers, acting on probable cause pursuant to statutory authority, broke into Payton's residence for the purpose of arresting him. The suspect was not there but at the subsequent trial the court admitted evidence found in plain view by the officers who entered the residence. Under the United States Supreme Court's holding, the evidence had to be excluded as the fruit of the illegal warrantless entry. Thus the consequence of the holding of illegality was the reversal of the murder conviction because of the admission of illegally seized evidence.
In Riddick v. New York, the companion case of Payton, officers went to Riddick's home to arrest him based on probable cause to believe he had committed a felony. They knocked on the door and a member of the household opened the door. Through the open doorway the officers could see Riddick. They entered the apartment and arrested him. A search of the immediate area where Riddick was found (a "search incident to arrest") uncovered illegal drugs and paraphernalia. Although the door was opened to the officers and no objection or attempt to block their entry was made, the Court found the entry was nonconsensual because when the door was freely opened by a child the officers entered before the suspect had an opportunity to object. The admission of the evidence gained by the search incident to arrest was approved by the state courts but was held reversible error by the United States Supreme Court because of the illegality of the warrantless arrest carried out inside Riddick's home.
In the instant case the trial court interpreted Payton to mean that although officers must have an arrest warrant to enter the home to make an arrest, the suspect may relieve them of the warrant requirement by consenting to their entry in which event the warrantless arrest may be carried out inside the suspect's home. The trial court found that by opening his door and inviting (constructively if not expressly) the officers to enter, the defendant consented to the entry thereby allowing the arrest to be made inside the home without a warrant. The majority of this Court sustains the trial court's finding of fact on this point and agrees with its interpretation of Payton.
It is true, as the majority points out, that Payton by its terms only applies to forcible entries and that many courts have held that a warrantless arrest of a suspect who consents to police entry or who voluntarily steps outside, giving up the protective envelope of the private home, is not one carried out by nonconsensual entry within the meaning of Payton. However, I believe that a careful examination of these authorities is necessary to a complete understanding of their teaching and their application to this case.
Various state and federal appellate courts have taken the view that the rule of United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), has survived the announcement of the Payton doctrine and that under Santana, an arrest at the threshold of the home when the suspect is voluntarily there may be made without a warrant. See, e.g., United States v. Mason, 661 F.2d 45 (5th Cir.1981); People v. *476 Morgan, 113 Ill. App.3d 543, 69 Ill.Dec. 590, 447 N.E.2d 1025 (Ill.Ct.App. 1st Dist. 1983). However, Santana involved more than a simple arrest at the threshold by consent of the suspect.
In Santana, routine investigative operations conducted by police gave rise to probable cause to believe not only that Santana had only moments before effected an unlawful sale of drugs, but also that she had on her person specific known evidence of the commission of the felony. The evidence  marked money used by an undercover operative to make the drug purchase  was highly necessary to the police because it would provide corroboration of and would be more credible than only the word of the intermediary, the offender who made the purchase from Santana at the request of the undercover agent. Thus when officers approached Santana's home and saw her standing in the open doorway, they had probable cause to arrest and exigent circumstances justified making the arrest immediately because the marked bills could have been disposed of if the officers took time to obtain an arrest warrant. The Court held that, although Santana, on seeing the approaching officers, retreated into her home and tried to close the door, the officers were justified in making the brief, warrantless incursion into the vestibule of the home necessary to effect the arrest.
Although the Court noted that under United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), warrantless arrests in public are permitted, and found that when Santana was standing in her open doorway in public view, she had no more fourth amendment protection than a person on the street, the exigency of the situation was clearly the weightier consideration. The Court described the situation as a true "hot pursuit" case in which there was a genuine need to act quickly to prevent the loss of valuable evidence, citing Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) and Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).
In United States v. Botero, 589 F.2d 430 (9th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979), a pre-Payton case, it was held that there was no "entry" into a private home to make the arrest where the suspect answered the officer's knock at the door and was arrested at the threshold. But it is highly significant that the Court also noted that an entry into the residence to make the arrest without a warrant would have been justified by exigency in that there was reasonable ground to believe that destructible contraband evidence was present therein.
With regard to the Illinois cases cited in the majority opinion, it should be noted that Illinois was one of the minority of states that required warrants for arrests in the home in nonexigent circumstances even before Payton. E.g., People v. Thompson, 93 Ill. App.3d 995, 49 Ill.Dec. 468, 418 N.E.2d 112 (Ill.Ct.App. 1st Dist. 1981); People v. Haynes, 89 Ill. App.3d 231, 44 Ill.Dec. 510, 411 N.E.2d 876 (Ill.Ct.App. 1st Dist. 1980).
In People v. Morgan, 113 Ill. App.3d 543, 69 Ill.Dec. 590, 447 N.E.2d 1025 (Ill.Ct.App. 1st Dist. 1983), it was held that a warrantless arrest on probable cause of one standing in the open doorway of his home is permissible. Citing Santana, the court reasoned that one standing in an open doorway is in a public place for fourth amendment purposes. There was no entry, so it was held that Payton did not apply.
In People v. Thompson, it was held that exigent circumstances justified the warrantless arrest, but the court also noted that the defendant failed to prove that the entry was nonconsensual. In People v. Haynes, the warrantless entry for the purpose of arrest was justified by exigent circumstances. As an afterthought the court noted that Payton was distinguishable because the entry was by consent.
The two remaining post-Payton cases cited by the majority opinion on this issue are Davis v. State, 275 Ark. 264, 630 S.W.2d 1 (1982) and State v. Patricelli, 324 N.W.2d 351 (Minn. 1982). In Davis, a warrantless arrest in the suspect's home for felony was *477 held proper on the ground that the entry was by consent so that Payton did not apply. It should be noted, however, that in Davis, when the officer went to the defendant's home, he did not have probable cause to arrest him. He went there merely to question the suspect. In the process of questioning him, the officer developed probable cause for the arrest. Thus the case only indirectly supports the proposition that entry by consent, for the purpose of making an arrest, does not violate Payton. In State v. Patricelli, it was held that when a suspect voluntarily opens his door in response to police knocking, he gives up the protection of the fourth amendment so that a warrantless arrest may be made at the threshold.
Testimony presented at the pretrial hearing on defendant's motion to suppress his confession established that during the evening of October 27, 1981, police interrogated Ronald Sullivan and obtained information from him implicating appellant in the crime. Late that night, officers summoned an assistant state attorney for legal advice on how to proceed. While the record does not show what the state lawyer told them, it is apparent that his advice was to go ahead and arrest appellant immediately without obtaining an arrest warrant. The assistant state attorney accompanied the officers who made the arrest. One officer testified that when the arresting officers approached appellant's door, the assistant state attorney stood around the corner of the building as a safety precaution.
Under the majority opinion, when police officers call at the door of a residence and the occupant-suspect answers by opening the door and constructively consenting to entry by stepping back, the Payton prohibition on warrantless arrests in the home does not apply. The effect of this holding is that suspects who are courteous and cooperative towards the police can be arrested in their homes without warrants while those who know they are being sought or have something to hide from the police can simply remain within, not answer the knock of the police, retain the protection of the fourth amendment, and force the police to obtain an arrest warrant. If appellant had not opened his door, it is clear under Payton that the police would not have been authorized to make a forcible entry to arrest him. Yet it is apparent that the officers intended to arrest appellant at 2:30 in the morning on October 28. The assistant state attorney stood off to the side in order to be safe from any violent resistance the officers might have encountered in effecting the arrest.
If Payton is to have any meaning, its application cannot be made to depend on the vagaries of how suspects respond to the call of the police at the entry to the home. The police do not know ahead of time how the suspect will respond. If there is no consent to entry or voluntary giving up of the protective bounds of the home, and the arrest to be made is a "routine" one, then the police must come away empty-handed. It is much better police practice to get an arrest warrant before even approaching a suspect's home to make a "routine" felony arrest.
I conclude that appellant's arrest was illegal under Payton. This conclusion brings up the question of whether appellant's in-custody statements made later on the morning of the arrest were the products of the illegal arrest. There was nothing to sever the connection between the illegal arrest and the confession. At the time of the arrest, the police also took into custody appellant's girlfriend. The majority says she accompanied police voluntarily but it is clear from the record that she was detained and had no idea that she was free to refuse to go. Once at the police station, the officers used the detention of the girlfriend as a subtle ploy to induce appellant to confess.
I would reverse the conviction and remand for a new trial.