# MEASE HOSPITAL AND CLINIC v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES and MORTON F. PLANT HOSPITAL, INC., (Intervenor)[1]

## Case No. 87-2402

State of Florida, Division of Administrative Hearings

May 12, 1988

### APPEARANCES OF COUNSEL

**Robert D. Newell, Jr.,** for petitioner.

**John Rodriguez,** for respondent.

**Cynthia S. Tunnicliff,** for intervenor.

### OPINION OF THE COURT

J. LAWRENCE JOHNSTON, Hearing Officer.

---

[1] The caption reflects the deletion of Community Hospital of New Port Richey and St. Anthony's Hospital as parties based on the notice of voluntary dismissal filed by each of them.

## RECOMMENDED ORDER

This proceeding arose on the application of the Petitioner, Mease Hospital and Clinic, for a certificate of need to equip and operate a cardiac catheterization laboratory at its hospital in Dunedin. As part of the application, Mease also asserted that it is entitled to be "grandfathered" as a provider of the cardiac catheterization services for which it seeks certification and also seeks determination of the "grandfather" issue. But the Respondent (HRS) and the Intervenor, Morton F. Plant Hospital, Inc., object to consideration of the "grandfather" claim in this proceeding, arguing that the "grandfather" claim is not properly at issue in this case. In order to rule on the objection, fact finding was necessary. As a result, three primary factual issues are presented: (1) whether Mease has properly presented the "grandfather" claim for determination as part of this proceeding; (2) if so, whether Mease has cardiac catheterization services which are entitled to be "grandfathered;" and (3) if Mease does not have cardiac catheterization services which are entitled to be grandfathered, whether there is a need for the cardiac catheterization services for which Mease seeks certification.[2]

Final hearing on the issues presented was held on January 18 through 20, 1988, in Clearwater. After the hearing, the parties ordered the preparation of a transcript of the final hearing and asked for 30 days from the filing of the transcript to file proposed recommended orders. The transcript was filed on March 21, 1988, making proposed recommended orders due on April 20, 1988. Explicit rulings on the parties' proposed findings of fact may be found in the attached Appendix To Recommended Order, Case No. 87-2402.

## FINDINGS OF FACT

### A. Whether the "Grandfather" Issue Should Be Determined

1. The Petitioner, Mease Hospital and Clinic (Mease), operates a 278 bed hospital in Dunedin, a 100 bed hospital in Countryside, and a

---

[2] To elaborate, by Prehearing Stipulation, the parties stipulated:
that the criteria contained in § 381.494(6)(c), (4), (5), (7), (8), (10), (11), (13) and § 381.494(6)(d), (5) are not at issue in this case or that the applicant satisfies those criteria. The criteria contained in § 381.494(6)(c), (3) and (9) have been satisfied by the applicant, except to the extent that the applicant must prove projected utilization sufficient to maintain quality of care and long term and immediate financial feasibility. The parties stipulate that the criteria contained in Rule 10-5.011(1)(e) 7.c,d, 8.a,b, 9.a,b,c,e, 10, 13, 15 and 15.b are either non-applicable or have been satisfied by the applicant.

medical clinic. All are located in north Pinellas County, in the North Pinellas subdistrict of HRS District 5.

In 1982, Mease applied for a certificate of need to equip and operate a cardiac catheterization laboratory (CCL). At the time, Mease was of the view that a CCL would be a new service and would therefore require a certificate of need. When Mease determined that approval would not be likely under then current rules, Mease withdrew its application because it understood that a final denial legally would preclude Mease from re-applying for three years.

3. On July 11, 1986, the Respondent, HRS, entered a Final Order adopting a Recommended Order and acknowledging that Humana Hospital Northside, also located in Pinellas County, HRS District 5, continuously had been providing cardiac catheterization services since before July 1, 1977, the effect date of certificate of need regulation of CCLs, and therefore was not required to obtain a certificate of need for a CCL as a new service. Final Order, *Humana Hospital Northside v Department of Health, etc.,* 8 F.A.L.R. 3910 (DHRS July 11, 1986).

4. When Mease reviewed the Humana Northside Final Order and final hearing transcript, it concluded that it, too, should be "grandfathered." Mease was doing the same type catheterization procedures as Humana Northside. Mease decided to re-apply for a certificate of need both on the basis of need for a CCL at Lease and on the basis of the "grandfather" claim.

5. In October, 1986, Mease filed the pending certificate of need application. In addition to the more typical components of a CON application, the Mease application states in pertinent part:

EQUIPMENT/SERVICE TYPE:

Mease Hospital and Clinic maintains that the Cardiac Catheterization Program is not a new service, as procedures similar to those performed at Humana Northside, which was recently approved on a grandfathering basis for cardiac catheterization have been performed at Mease Hospital and Clinic in Dunedin for more than 20 years.

\* \* \*

ADDITIONAL PROJECT DETAILS/REMARKS:

Mease Hospital and Clinic believes its historic performance of procedures identical to those for which Humana Northside was grandfathered a cardiac catheterization lab is sufficient to justify similar action, resulting in approval of Mease' proposal.

6. HRS' State Agency Action Report (SAAR) was completed in

234

April, 1987. It evaluated the Mease proposal as a typical certificate of need application and denied it on the basis of lack of need. There was no direct mention of the "grandfather" claim, but the SAAR concludes in pertinent part: "Deny a certificate of need for [the Mease] project [among others] in its entirety. . . . Reasons for decision: Insufficient need for an additional cardiac cath lab."

7. Mease's petition for formal administrative proceedings on the denial does not specifically address the "grandfather" claim, either. During the pendency of this proceeding, Mease continued to seek a "grandfather" exemption apart from this proceeding. But Mease's prehearing proceedings in this case were conducted in a way that indicated its assumption that the "grandfather" issue would be determined by final agency action in this case, if not before by informal means. The other parties recognized this assumption and were not prejudiced by Mease's failure to formally specify the issue in its pending petition for formal administrative proceedings or by amendment to it.

8. By letter dated November 23, 1987, HRS finally responded to Mease's continued efforts to obtain "grandfather" status and denied the request. Mease still did not amend its petition for formal administrative proceedings (nor did it file a new, separate petition in response to the November 23 letter.) But it continued to conduct prehearing procedures in a manner so as to have the "grandfather" claim heard as part of this case. HRS and the Intervenor, Morton F. Plant Hospital, Inc. (Morton Plant) first objected on the record to consideration of the "grandfather" issue in this case in the Prehearing Stipulation filed on January 6, 1988.

9. The "grandfather" issue should be determined in this proceeding.

### B. Whether Mease Has A "Grandfathered" CCL

10. Before July 1, 19877, and continuously since, Mease has operated a special procedures room at its Dunedin hospital. The special procedures room is the largest room in the x-ray department, with adjoining rooms that contain sinks for sterile technique and housing computers. Equipment in the room includes an x-ray generator with a high MA capability to do moderately rapid sequence films and fluoroscope. There is a table of special design to allow movement in all directions to facilitate fluoroscopy. Three different film changers are used. The room contains a large array of catheters, wires and needles for use in the catheterization process. There is defibrillator monitor, pressure monitors, and various physiologic monitors also in the room. Finally, there is a digital vascular impaging ("DVI") machine to facilitate the

computerized processing of digital subtraction studies. The DVI machine has been used to perform coronary arteriographies.

11. During the time the special procedures room has been operation, it has been staffed with persons specifically trained in critical care of patients, with special knowledge of cardiovascular medication and catheterization type equipment. There has always been ample support staff available for patient observation, handling blood samples, performing blood gas evaluations and monitoring physiological data.

12. The catheterization team usually consists of the physician, a special procedures nurse (an R.N. with critical care training) and at least two dedicated radiographer technologists with special knowledge of the equipment. A special procedures log is maintained by physicians using the special procedures room. Procedures typical of those contained on the log prior to and consistently since 1977 include renal arteriograms, pulmonary arteriograms, cerebral arteriograms and femoral arteriograms. Pulmonary arteriograms involve passing a catheter through a right side chamber of the heart into the lungs; the other procedures do not involve passing a catheter into the heart.

13. Pulmonary angiograms, right ventriculography and right atrial injections are all currently performed at Mease in the radiology laboratory. Right heart catheterization procedures are being performed in the CCU units and the special procedures lab at Mease.

14. The special procedures room is not used by radiologists or cardiologists to do any therapeutic or diagnostic studies of the left chambers of the heart. Unlike procedures such as pulmonary arteriograms, in which the catheter is inserted into or through a chamber on the right side of the heart, fluoroscopy is required for insertion of a catheter into a chamber of the left side of the heart. With fluoroscopy, left heart catheterization procedures involve no significantly increased danger to the patient. Left heart catheterization procedures require faster film sequencing equipment for fluoroscopy because the left heart is a higher pressure (faster flow) system than the right heart chambers. Mease's cardiologists perform these procedures in a CCL at either Morton Plant or Large Medical Center in Clearwater.

15. The Mease special procedures room does not have, and has not had, the more sophisticated equipment needed to perform catheterization procedures in the left chambers of the heart.

16. The sophisticated equipment needed for left heart catheterizations customarily is part of a CCL. It is commonly understood that a CCL is a laboratory which includes this equipment and uses this equipment for left heart catheterizations. Mease shared this under-

236

standing until it learned of the Final Order in *Humana Hospital Northside.* It never contested the omission of cardiac cath services from its hospital license, never reported cardiac cath procedures to the local health council and applied for a CON for a CCL in 1982.

17. On review of the *Humana* final order and the record of the case, Mease correctly concluded that its special procedures room was being operated in the same way as Humana Northside's. Mease also concluded that it, too, was entitled to "grandfather" status. But the *Humana* final order points out:

> The respondent HRS offered no evidence to dispute the fact that petitioner has indeed been providing cardiac catheterization services on a regular and continuous basis from pre-July 1, 1977 to the present time. Instead, HRS takes the position that since petitioner never reported to the Local Health Council that it was performing such services, it is now somehow estopped from claiming a "grandfather" exemption from Certificate of Need review.

> There is competent and substantial evidence demonstrating that petitioner began performing cardiac catheterization procedures prior to July 1, 1977, at a time when Certificate of Need review was not required, and has continued to perform such services on a regular basis. Accordingly, petitioner was exempt from Certificate of Need review when it initiated such services and continues to maintain that exempt status so long as it regularly and continuously performs such services.

18. In this case, there was persuasive evidence disputing that Mease has been operating a CCL. Mease's special procedures room had some, but not all, of the equipment customarily used in cardiac catheterization. Its special procedures room is not the kind of room customarily used to perform cardiac catheterization procedures. This is why Mease never before claimed entitlement to "grandfather" status but rather presumed that it did not have a CCL and would need a CON to open a CCL.

19. Mease has not been operating a CCL continuously since July 1, 1977.

## C. *Need For Mease's Proposed CCL*

20. Mease filed the pending CON application in October, 1986. At the time, the local health council for District 5 was reporting an inventory of four CCLs: St. Anthony's; Morton Plant; Largo; and All Children's. Mease also knew that HRS had entered a final order in July, 1986, recognizing "grandfather status" for Humana Northside

**237**

and allowing Humana Northside to upgrade its CCL by adding up-to-date equipment required for left heart catheterization procedures.

21. At the time of the State Agency Action Report (SAAR) denying Mease's application in April, 1987, HRS was aware of, and also counted in the inventory at the time of the SAAR, a second CCL at Morton Plant which was added without CON review. The second Morton Plant became operational in July, 1986, but was not reported to the local health council until early 1987, and was not reported by the local health council until September, 1987. A second CCL also opened without CON review at Largo Medical Center. But the evidence was not clear when the second Largo lab opened. It was not reported to, or by, the local health council before the SAAR either, and HRS did not count it in the inventory for purposes of the SAAR. Since the SAAR, two additional CCLs have been approved without CON review at Bayfront Hospital/All Children's Hospital in St. Petersburg. Finally, on November 24, 1987, the District Court of Appeal, First District, rendered an opinion reversing HRS' final order denying an application for a CON for a CCL at Bayonet Point Regional Medical Center is Pasco County in District 5. This CCL was approved for purposes of meeting the need existing as of 1986.

22. The actual District 5 CCL use rate for the period July, 1985, through June, 1986, using local health council data, was 308.47 procedures per 100,000 population. The year in which the proposed CCL would initiate service, but not more than two years into the future, is July, 1988. The District 5 population in July, 1988, is projected to be 1,124,986. The number of procedures projected for District 5 in July, 1988, is 3470. Allocating 600 procedures per CCL, 3470 procedures would create a numerical need for 6 CCLs in District 5 in July, 1988.

23. The local health council did not report any procedures done at the "grandfathered" CCL at Humana Northside, and none were included in the data for the time period July, 1985, to June, 1986.

24. Counting the "grandfathered" Humana Northside CCL in the inventory at the time of the SAAR without attributing any procedures to it for purposes of calculating the use rate for July, 1985, to June, 1986, amounts to a recognition that Humana Northside, while given "grandfather" status based on the facts presented in DOAH Case No. 84-4070, was not in fact operating a CCL continuously since July, 1977. Refusal to attribute procedures to Humana Northside reflects a rational policy decision in this case not to perpetuate the error

238

resulting from the apparently less-than-adequate HRS presentation of its case in the Humana Northside case.[3]

25. There was evidence officially recognized in this case without objection—namely, the Final Order, *Bayonet Point Medical Center v Department of Health and Rehabilitative Services,* 8 F.A.L.R. 4342 (DHRS 1986)—that 1200 Pasco County (District 5) residents were being referred to Tampa for cardiac catheterization and open heart surgery in the year preceding June, 1986. (300 were open heart surgery patients.) But there was no evidence to prove how many of the 900 cardiac catheterization patients who were referred to Tampa in the period July, 1985, to June, 1986, would have had the procedure performed in District 5 if Bayonet Point had a CCL. It necessarily follows that there was no evidence to prove that any additional cardiac cath procedures for Pasco County patients performed in District 5 as a result of the Bayonet Point CCL will not be absorbed by and performed at the Bayonet Point CCL.

26. District 5 has the highest percentage of 65 and over population in the state (29.7% for calendar year 1986), but next to the lowest number of catheterizations per thousand of all the districts in the state. District 5 also has a large cohort of population age 45 to 64. Over 50% of the population in District 5 is in the age cohort for which cardiac catheterization is most frequently needed as a diagnostic or therapeutic tool. Seasonal fluctuations increase the elderly winter population. Resident death rate from heart disease is almost 50% higher in District 5 than it is for the state of Florida.

27. These factors combine to create an actual use rate in District 5 that, for the past two years (1986 and 1987) has exceeded (or, for 1987, was projected to exceed) the projected horizon year (July 1988) use rate derived from using the 1985 use rate data. The actual use rate for January through September 1987, when extrapolated for the entire calendar year of 1987, shows that the number of procedures expected to be actually performed in District 5 in 1987 is 46% (approximately 1,000 procedures) greater than the number of procedures projected to be needed in July 1988 using the 1985 use rate. The projection of procedures for July 1988 is 700 procedures less than actually occurred in District 5 in 1986. Use of July, 1985 to June, 1986, use rate in a demographic configuration like that found in District 5 underestimates projected procedures for July, 1988.

28. Some trends in health care and area population growth do not

---

[3] On the other hand, it would not be rational for HRS to adopt a policy that there is not statutory authority for "grandfather" status. See Conclusion of Law 2.

support the addition of a cath lab at Mease. While the population of north Pinellas County, where Mease is located, is equal in age distribution to south Pinellas County, the new growth in north Pinellas and Pasco is younger than south Pinelas. Increased use of non-invasive diagnostic procedures, such as MRI and CAT scan, will reduce the growth of cardiac cath procedures in the future. The growth in the use rate in cardiac caths is in the number of therapeutic caths, which by rule are required to be done in a facility with open heart surgery and therefore cannot be done at Mease at this time. Indeed, the number of right heart caths being done at Mease has remained constant over the past several years. Also, death from heart disease is decreasing due to improvements in life style.

29. All the cath labs in District 5 are within a two hour drive time of 90% of the population in District 5. Morton Plant is six miles from Mease Dunedin. Mease Countryside is twelve miles from Morton Plant and eight miles from Mease Dunedin. One-third of the Mease cardiologist's patients are at Mease Countryside and for catheterization these patients would have to be admitted at or transported to Mease Dunedin where the proposed lab would be located.

30. There is sufficient capacity in the existing cath labs to serve growth in the near future. Approximately 600 more procedures could be done at Morton Plant. There is no problem scheduling caths at Morton Plant. There has been some difficulty getting beds for Mease patients before and after the procedure, but Morton Plant just opened new ICU beds with specially trained nurses to accommodate Dr. Gibbs' patients.

31. The existing labs in District 5 are financially accessible. A significant number of the labs are located in not-for-profit hospitals that serve all types of patients. *E.g.,* Morton Plant, which has an overlapping service district with Mease, offers twice the number of Medicaid days as Mease.

32. In addition, as previously mentioned, new approved labs at Bayfront/All Children's (2) and Bayonet Point (1) will be coming on line to provide additional capacity (and bring the total number of CCLs in District 5 to ten.)

## CONCLUSIONS OF LAW

1. Mease did not raise in any pleading in this proceeding before the Prehearing Stipulation the issue whether its existing special procedures room should be recognized as a "grandfathered" CCL. When it did so in the Prehearing Stipulation, HRS and Morton Plant objected. But the

240

Findings of Fact demonstrate that Mease attempted to have the issue determined in the context of its CON application and put HRS and Morton Plant on notice through means other than pleadings that it was intended to attempt to have the "grandfather" issue determined as part of this proceeding. The facts also show that neither HRS nor Morton Plant will be prejudiced by determination of the issue in this proceeding. The objection of HRS and Morton Plant is therefore overruled, and the issue will be considered and determined.

2. Commencing July 1, 1988, CON review was required when a hospital sought to provide a substantial change in services. See Section 381.494(1)(c), Florida Statutes (1985),[4] and Rule 10-5.002(19), Florida Administrative Code. There is no explicit statutory recognition of an existing service as a "grandfathered" CCL. But it is a well established rule of statutory construction that, in the absence of clear legislative intent to the contrary, the law is presumed to act prospectively. 49 FLA.JUR.2d *Statutes* § 107(1984). The courts look to the language of the statute itself to determine whether a clear legislative mandate for retroactive application exists. The inclusion in a statute by the legislature of an effective date has been held to rebut any argument that retroactive application of law was intended. *Department of Revenue v Zuckerman-Vernon Corporation*, 354 So.2d 353 (Fla. 1977). This rule of construction applies with particular force in a case such as this, when Mease seeks recognition of its vested and preexisting right to provide cardiac catheterization services. Accordingly, CON review of a "substantial change in service" does not apply to services which have not changed but pre-existed the effective date of CON review.

3. As to the "grandfather" issue, the Findings of Fact lead to the conclusion that Mease is not entitled to recognition as a "grandfathered" CCL. Rule 10-5.011(1)(e)1., Florida Administrative Code, defines a CCL as "a room or suite of rooms in a hospital *which has the equipment,* staff and support services *required* to perform angiographic and physiologic cardiac catheterization procedures, *and which is customarily used* to perform cardiac catheterization procedures." (Emphasis added.) Rule 10-5.011(1)(e)4. defines "procedure" as "an angiographic study or a therapeutic activity *within a cardiac catheterization laboratory which utilizes the equipment customarily used in cardiac catheterization.*" (Emphasis added.) The Findings of Fact demonstrate that Mease's special procedures room does not have, and does not use,

---

[4] By enactment of Chapter 87-92, Laws of Florida (1987), the Legislature replaced Sections 381.493, et seq., with Sections 381.701, et seq., Florida Statutes. But the new law contains essentially the same review thresholds pertinent to this case except that the capital expenditure thresholds were increased.

all of the equipment customarily used in CCLs to perform cardiac catheterization, which includes left heart catheterizations. Construction and operation of a CCL at Mease would therefore be a substantial change in services requiring CON review, not a "grandfathered" service.

4. Section 381.494(6)(c),(1), (2), (6) and (12) and (d), (1), (2), (3) and (4), Florida Statutes (1985), sets forth the substantive criteria against which Mease's application must be evaluated. The relevant criteria are as follows:

(6)(c) The department shall determine the reviewability of applications and shall review applications for certificate-of-need determinations for health care facilities and services, hospices, and health maintenance organizations in context with the following criteria:

1. The need for the health care facilities and services and hospices being proposed in relation to the applicable district plan and state health plan adopted pursuant to Title XV of the Public Health Service Act, except in emergency circumstances which pose a threat to the public health.

2. The availability, quality of care, efficiency, appropriateness, accessibility, extent of utilization, and adequacy of like and existing health care services and hospices in the service district of the applicant.

\* \* \*

6. The need in the service district of the applicant for special equipment and services which are not reasonably and economically accessible in adjoining areas.

\* \* \*

12. The probable impact of the proposed project on the costs of providing health services proposed by the applicant, upon consideration of factors including, but not limited to, the effects of competition on the supply of health services being proposed and the improvements or innovations in the financing and delivery of health services which foster competition and service to promote quality assurance and cost-effectiveness.

(6)(d) In cases of capital expenditure proposals for the provision of new health services to inpatients, the department shall also reference each of the following in its finding of fact:

1. The less costly, more efficient, or more appropriate alternatives to such inpatient services are not available and the development of such alternatives has been studied and found not practicable.

2. The existing inpatient facilities providing inpatient services similar to those proposed are being used in an appropriate and efficient manner.

3. In the case of new construction, that alternatives to new construction, for example, modernization or sharing arrangements, have been considered and have been implemented to the maximum extent practicable.

4. That patients will experience serious problems in obtaining inpatient care of the type proposed, in the absence of the proposed new service.

5. Implementing these statutory standards is Rule 10-5.011(1)(e), Florida Administrative Code, which sets forth te methodology to be used to determine need for cardiac cath services in the health planning districts. HRS will not normally approve applications for CON unless need is indicated as calculated by Rule 10-5.011(1)(e)12, Florida Administrative Code. The methodology determines a projected number of procedures by multiplying the actual use rate in the service area for the 12-month period beginning 14 months prior to the letter of intent times the projected population in the year the cath lab would initiate service. As found, the methodology projects 3470 procedures in July, 1988, the planning horizon in this case. Rule 10-5.011(1)(e)15., Florida Administrative Code, provides both that no CCL will be added in a district unless "[t]he average number of catheterizations performed per year by existing and approved laboratories performing adult procedures in the service area is greater than 600" and that "[a]pplications proposing to establish cardiac catheterization laboratories will not be approved if they would reduce the *average* volume of procedures performed by laboratories in the service area below 600 adult procedures . . . based on projected need in the service area."[5] (Emphasis added.)

Rule 10-5.011(1)(e), Florida Administrative Code, does not specify when the inventory of existing and approved CCLs is counted. By non-rule policy, HRS counts the inventory at the time of the SAAR for purposes of the rule methodology calculation. See Finding of Fact 21. This policy choice is reasonable and consistent with sound health planning principles. It enables HRS to base its health planning decision

---

[5] *In addition,* Rule 10-5.011(1)(e)9.d., Florida Administrative Code, provides: "[I]n order to assure quality of service, there shall be a minimum of 300 cardiac catheterizations performed annually *in any* adult cardiac catheterization laboratory within three years following its initiation of service." (Emphasis added.) This provision does not reduce the requirement for projected need in the service area to *average* 600 per CCL.

on information more current than available at the time of the application.

7. By non-rule policy, HRS also looks behind the local health council data to ascertain the true inventory at the time of the SAAR. This policy not only is reasonable, it is required by the case law. *Balsam v Department of Health and Rehabilitative Services,* 486 So.2d 1341 (Fla. 1st DCA 1986).

8. Under the statutory regulatory scheme, no CON is needed to add a CCL to existing CCL services so long as the capital expenditure threshold is not exceeded. See Section 381.494(1)(c), Florida Statutes (1985). As a result, Morton Plant was able to add a CCL without CON review which counted in the inventory at the time of the SAAR. Due to this peculiar feature of the CON law, Mease was required to make the investment of money and time necessary to apply for a CON for a CCL without knowing in advance what the inventory of existing and approved CCLs would be at the time of the SAAR. This makes it difficult, if not impossible, for a provider to plan to apply for CON for a CCL.[6]

9. One of the CCLs HRS counted at the time of the SAAR was the "approved" Humana Northside lab. The evidence proved that Humana Northside was not doing anything substantially different than Mease during the period after July 1, 1977. It therefore should not have been recognized as having a "grandfathered" CCL, either. Yet, based on the evidence presented in the Humana Northside case, it was given "grandfather" status. Although Humana Northside did not have a CCL and reported no procedures to the local health council, it is reasonable to include its approved CCL in the inventory for purposes of the rule methodology calculation in this case. Otherwise, the error made in the Humana Northside case would be perpetuated.

10. Applying Rule 10-5.011(1)(e), Florida Administrative Code, the 3470 procedures projected for July, 1988, creates a need for six CCLs in July, 1988. (3470 procedures - 600 procedures per lab 5.78). Since there were six CCLs existing or approved at the time of the SAAR, the rule does not demonstrate a need for Mease's proposed CCL.

11. The mere fact that the rule methodology historically has under-estimated projected procedures in District 5 does not in itself establish "not normal circumstances" requiring issuance of a CON. Cf. Rule 10-

---

[6] In addition, by allowing existing providers of CCL services to add CCLs without CON review, the law makes it very difficult, if not impossible, for proposed new providers of CCL service to obtain a CON. As a result of this unfortunate feature of the law, the prospects for increased competition are seriously impaired.

5.011(1)(e)6., Florida Administrative Code. In *NME Hospitals, Inc. v Department of Health and Rehabilitative Services,* 494 So.2d 256 (Fla. 1st DCA 1986), the court upheld HRS' conclusion of law that using higher actual use rates instead of the use rate calculated under the then existing rule methodology *and allocating 600 procedures per CCL in accordance with the rule methodology* impermissibly challenges the rule as invalid and substitutes an alternate rule methodology. Under the court's (and HRS') reasoning, HRS' choice of the 600 procedure per CCL allocation standard in the rule methodology deliberately presumes the use rate calculation also incorporated in the rule. The use rate should not be increased without giving HRS the opportunity by rule to likewise adjust the allocation standard.

12. Rule 10-5.011(1)(e)6., Florida Administrative Code, states: "The Department will not normally approve applications for new cardiac catheterization laboratories in any service area unless additional need is indicated, as calculated by the formula in subparagraph 12. below [the calculation of projected procedures], and unless the application satisfies the requirements set forth in subparagraph 15. below [the allocation standard for determining need.]"

13. The decision in *Humana, Inc. v Department of Health and Rehabilitative Services,* 469 So.2d 889, 891 (Fla. 1st DCA 1985), held that, if the CCL rule methodology in effect at the time resulted in an underestimation of need for additional services, the provision of the rule that corresponds to the present Rule 10-5.011(1)(e)6. gives an applicant "the opportunity to demonstrate need by showing that existing facilities are unavailable or inaccessible, the quality of care in the service area is suffering from over utilization, or by providing other information to illustrate that the situation is not 'normal' in the service area." In *Humana, Inc. v Department of Health and Rehabilitative Services,* 492 So.2d 388, 392 (Fla. 1st DCA 1986), also dealing with the CCL rule methodology in effect at the time, the court held:

While the use of the [actual] utilization data is properly taken into consideration in determining whether the . . . use rate under the rule formula results in an underestimation of the need for additional services in the area, the use of the more current data alone is not sufficient to justify an exception to the rule. The applicant must demonstrate and there must be some finding of fact that, without the requested lab, the existing facilities are (or will be) unavailable or inaccessible, or the quality of care is (or will be) suffering from over utilization, or other evidence of that nature.

14. On the facts of this case, there is no geographic inaccessibility in

**245**

District 5 that would be ameliorated by a CCL at Mease Dunedin. Cf. Rule 10-5.011(1)(e)8.a, Florida Administrative Code. Likewise, there was no proof of financial inaccessibility that Mease's proposal would relieve. Cf. Rule 10-5.011(1)(e)8.c, Florida Administrative Code.

15. Facilities existing at the time of the final hearing, not at the time of the SAAR, are to be considered in determining whether circumstances are "not normal" because facilities are unavailable. At the time of the final hearing, seven CCLs were operating in District 5, including two each at Morton Plant and Largo Medical Center and one at Humana Northside. Although still available, even during the peak winter season, scheduling difficulties occurred during peak season when Mease's cardiologists only were making use of either Morton Plant's or Largo's CCL(s). In addition, during peak season, pre-op and post-op CCU/ICU beds and other health care services attendant to a cardiac cath procedure were scarce. Because Mease doctors and patients seemed to have been given lower priority, some of these scarce resources were not made available to Mease during peak season. But now Morton Plant has taken action to make these kinds of resources more available to Mease. In addition, use can be made of the Humana Northside facility if Mease cardiologists get staff privileges there. Finally, two new CCLs at Bayfront/All CHildren's in St. Petersburg and one new CCL at Bayonet Point in Pasco County will help make CCLs in District 5 more available.

16. Mease also attempted to prove that circumstances were "not normal" in District 5 by showing that the population in significant age cohorts is increasing rapidly in District 5 and that the use rate in District 5 is increasing faster than in Florida as a whole. But, to some extent, these facts are considered in the rule need methodology and do not, of themselves, prove abnormal circumstances. Cf. *Health Care and Retirement Corporation v Department of Health and Rehabilitative Services*, 489 So.2d 789, 792 (Fla. 1st DCA 1986); *Federal Property Management Corporation v Department of Health and Rehabilitative Services*, 481 So.2d 475, 477 (Fla. 1st DCA 1986); *Health Quest Realty XII v Department of Health and Rehabilitative Services*, 477 So.2d 576, 578-579 (Fla. 1st DCA 1985). The same type of data was presented in *Plantation General Hospital v Department of Health and Rehabilitative Services and North Broward Hospital District v Department of Health and Rehabilitative Services*, 9 F.A.L.R. 5880 (DHRS 1987). The hearing officer in that case, citing *Humana*, 469 So.2d 889, found that the use of such data alone is not sufficient to justify an exception to the rule. The applicant still must demonstrate that the existing facilities are unavailable, inaccessible or over utilized. *See also*

**246**

*NME Hospital, Inc. d/b/a Hollywood Medical Center v Department of Health and Rehabilitative Services,* 7 F.A.L.R. 3081, 3098 (DHRS 1985) ("Need must be assessed upon all the evidence if a 'not normal' need is proposed by an applicant. The critical question then is whether the evidence shows that for some reason a significant number of patients will be denied te service if the application is not approved. This issue could involve proof that existing providers will fail to serve a significant need either due to lack of capacity, lack of accessibility, poor management or quality of care, or other similar reasons.")

17. Mease also points to the additional cost and problems *to Mease* associated with transferring its patients to Morton Plant and Largo for cardiac caths. But " . . . CON law was designed to provide for community health needs in a responsible and cost effective manner without unnecessary duplication of health services." *Home Health Professional Services, Inc. v Department of Health and Rehabilitative Services,* 463 So.2d 345, 347 (Fla. 1st DCA 1985). "The question of need for additional facilities or services is to be evaluated in terms of the community at large and not on an institution-specific basis." *University Hospital of Jacksonville v Department of Health and Rehabilitative Services and Southern Baptist Hospital of Florida, Inc. d/b/a Baptist Medical Center,* 6 F.A.L.R. 5492, 5499 (DHRS 1984). The cost and inconvenience to Mease does not warrant issuance of a CON.

18. It is concluded that Mease has not proven a need for issuance of a CON for its proposed CCL at its Dunedin hospital.

## RECOMMENDATION

Based on the foregoing FIndings of Fact and Conclusions of Law, it is recommended that HRS enter a final order: (1) denying Mease's request for recognition of a "grandfathered" CCL at its Dunedin hospital; and (2) denying its application for a CON for a CCL at its Dunedin hospital, CON Action No. 5108.

RECOMMENDED this 12th day of May, 1988, in Tallahassee, Florida.